**Harriet MULQUEENY and Patricia Boehnke, Plaintiffs-Appellees, Cross-Appellants,**

v.

**NATIONAL COMMISSION ON the OBSERVANCE OF INTERNATIONAL WOMEN'S YEAR, 1975, Defendant-Appellant, Cross-Appellee.**

**Nos. 76–1840 and 76–1917.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1977.

Decided Feb. 24, 1977.

Robert E. Kopp and Neil H. Koslowe, Civ. Div., App. Section, Dept. of Justice, Washington, D. C., Donald B. Mackay, U. S. Atty., Springfield, Ill., for National Commission.

J. F. Schlafly, Jr., Alton, Ill., for Mulqueeny.

Before SPRECHER and TONE, Circuit Judges, and EAST, Senior District Judge.*

SPRECHER, Circuit Judge.

Defendant-appellant, the National Commission on the Observance of International Women's Year, 1975 (hereinafter referred to as the "Commission"), asserts three issues in its appeal from the entrance of a preliminary injunction restraining it from engaging in certain activities: (1) whether plaintiffs lack standing to litigate that the Commission's conduct violates specific Constitutional and statutory provisions; (2) whether the Commission's activities in disseminating information concerning the proposed Equal Rights Amendment constitute "lobbying activities," and thus contravene a specific prohibition embodied in Public Law

---

* Honorable William G. East, United States Senior District Judge for the District of Oregon, is sitting by designation.

94–167 [1] and 94–303; [2] and (3) whether the district court improperly exercised its discretion in entering a preliminary injunction. We hold that plaintiffs lack standing to sue for the relief requested, and therefore we do not consider the issues relevant to the merits of plaintiffs' claim.

I

The Commission was established by Executive Order [3] on January 9, 1975 to promote national observance in the United States of 1975 as International Women's Year. To achieve this end, the Commission was equipped with the broad mandate of focusing the national consciousness "on the need to encourage appropriate and relevant cooperative activity in the field of women's rights and responsibilities." The President allocated specific functions as the "action agenda" of the Commission, including the tasks of promoting "equality between men and women," ensuring "the full integration of women in the total development effort," and encouraging "public and private sectors to set forth objectives to be achieved as part of the program observing International Women's Year." The Commission was expressly authorized to convene meetings when deemed appropriate and to "assemble and disseminate information, issue reports and other publications and conduct such other activities as it may deem appropriate to provide for effective participation of the United States in the domestic observance of International Women's Year."

Pursuant to its executive mandate, the Commission adopted a resolution urging ratification of the Equal Rights Amendment [4] and established an "ERA Committee," co-chaired by Alan Alda and Representative Margaret Heckler (R.Mass.), to disseminate information regarding ERA and to encourage discussion of the merits of the proposed amendment. The ERA Committee requested a ruling from the General Accounting Office delineating the parameters of its charge under Executive Order No. 11832. The Comptroller General of the United States issued an opinion letter [5] which affirmed that all proposed activities of the ERA Committee were encompassed

1. 89 Stat. 1003 (approved December 23, 1975). The pertinent part of the statute is Section 9, which provides:

> There are authorized to be appropriated without fiscal year limitation, such sums, but not to exceed $5,000,000, as may be necessary to carry out the provisions of this Act. Such sums shall remain available for obligation until expended. No funds authorized hereunder may be used for lobbying activities.

2. This appropriation statute provides, in pertinent part:

> For necessary expenses of the National Commission on the Observance of International Women's Year, 1975, as authorized by Public Law 94–167, $5,000,000, to remain available until expended: Provided, that none of the funds appropriated under this paragraph shall be used for lobbying activities.

3. Executive Order No. 11832, 40 Fed.Reg. 2415 (1975). The Order specified that membership of the Commission would consist of up to 35 private citizens, appointed by the President, and two members of each House of Congress, appointed by the President of the Senate and the Speaker of the House of Representatives. Commission members were to serve without compensation, but would be entitled to travel expenses as authorized by 5 U.S.C. § 5703 (1970).

The Commission was ordered to conclude its tasks by the end of 1975. On November 25, 1975, Executive Order No. 11889, 40 Fed.Reg. 54765, was issued sustaining the life of the Commission through June 30, 1976, and directing it to submit a final report of its activities to the President within 30 days of its termination.

4. The Commission also adopted the recommendations of a subcommittee which supported decisions of the Supreme Court regarding abortion issues and urged that family planning services be made available to women unable to take advantage of private facilities.

5. No. B–182398 (July 31, 1975). The ruling stated:

> The Executive Order confers wide discretion upon the Commission as to how it should *inter alia,* actively promote equality between men and women. The Commission in the exercise of that discretion has resolved to favor ratification of the ERA. To effectuate the Commission's resolution, the ERA Subcommittee intends to educate interested parties as to the impact of the amendment on sexual inequality in the United States and consult with the experts on how to best communicate the facts about ERA. In our view, the Subcommittee's planned activities are within the scope of the Executive Order, both in letter and spirit.

App. at 30.

within the scope of the authority accorded the Commission.

The Commission, in compliance with its Executive charge, submitted to the President on July 1, 1976 a report detailing its activities which was entitled ". . . To Form a More Perfect Union . . ."[6] The report focuses upon "barriers that keep women from participating in American life as full partners," and discusses a panoply of issues affecting American women, including the role of the homemaker, the image of women projected by the mass media, women's accomplishments and position in the arts and humanities, ERA, employment discrimination, child care services, family planning programs, and enforcement of existing laws prohibiting discrimination.

During the period that the Commission functioned under Executive mandate, the House of Representatives passed a resolution which called for "the launching of new programs and the forming of new attitudes toward the role of women, with impact reaching well beyond 1975, so as to over-

come the obstacles still encountered by women in exercising their full human rights and responsibilities in all fields, including education, the arts, and sports, and in enjoying freedom of choice in planning their lives." H.R.Cong.Res. 309, 94th Cong., 1st Sess. (1975). This resolution led to the enactment, after vigorous debate, of Pub.L. 94–167,[7] which prolonged the existence of the Commission and directed it to convene a National Women's Conference in order to "assess the progress that has been made toward insuring equality for all women, to set goals for the elimination of all barriers to the full and equal participation of women in all aspects of American life, and to recognize the importance of the contribution of women to the development of friendly relations and cooperation among nations and to the strengthening of world peace." In addition, Congress instructed the Commission to work toward the attainment of specific goals pertinent to the achievement of full equality for women,[8] and expressly provided that the statutory

**6.** This report was received in evidence during the proceedings in the district court, and is part of the record on appeal.

**7.** This legislation was passed by the House on December 10, 1975, the Senate on December 11, 1975, and approved by the President on December 23, 1975.

**8.** Pub.L. No. 94–167 delineates the Commission's goals and powers as follows:

COMPOSITION AND GOALS OF THE CONFERENCE

Sec. 3. (a) The Conference shall be composed of—

(1) representatives of local, State, regional, and national institutions, agencies, organizations, unions, associations, publications, and other groups which work to advance the rights of women; and

(2) members of the general public, with special emphasis on the representation of low-income women, members of diverse racial, ethnic, and religious groups, and women of all ages.

(b) The Conference shall—

(1) recognize the contributions of women to the development of our country;

(2) assess the progress that has been made to date by both the private and public sectors in promoting equality between men and

women in all aspects of life in the United States;

(3) assess the role of women in economic, social, cultural, and political development;

(4) assess the participation of women in efforts aimed at the development of friendly relations and cooperation among nations and to the strengthening of world peace;

(5) identify the barriers that prevent women from participating fully and equally in all aspects of national life, and develop recommendations for means by which such barriers can be removed;

(6) establish a timetable for the achievement of the objectives set forth in such recommendations; and

(7) establish a committee of the Conference which will take steps to provide for the convening of a second National Women's Conference. The second Conference will assess the progress made in achieving the objectives set forth in paragraphs (5) and (6) of this subsection, and will evaluate the steps taken to improve the status of American women.

(c) All meetings of the Conference and of State or regional meetings held in preparation for the Conference shall be open to the public.

POWERS OF COMMISSION

Sec. 4. The Commission shall—

(1) designate a coordinating committee in each State which shall organize and conduct

powers derived from the enactment were to be employed in addition to those powers derived from the Executive charge. An amount up to $5 million to effect these provisions was authorized to be appropriated without fiscal year limitation, with the proviso that "[n]o funds authorized hereunder may be used for lobbying activities." Some six months later, sharp, protracted debate in both Houses culminated in appropriation of the $5 million requested by the Commission, again with the proviso that these funds were not to be expended for lobbying activities.[9]

On April 9, 1976, prior to the appropriation of any funds to the Commission, plain-

tiffs filed a complaint alleging violation of Article V of the Constitution [10] and of the statutory prohibition against use of appropriated moneys for lobbying activities by the Commission's adoption of affirmative resolutions regarding ERA and family planning. Plaintiffs further alleged that members of the Commission were steeped in lobbying activities, appearing at legislative hearings, on media programs and at various luncheons for the purpose of urging ratification of ERA. In addition, plaintiffs alleged that the Commission constituted an "advisory committee" within the intent of the Federal Advisory Committee Act, and violated Section 5(b)(2) of the Act [11] in not

a State or regional meeting in preparation for the Conference;

(2) prepare and make available background materials relating to women's rights and related matters for the use of representatives to the State and regional meetings, and to the Conference;

(3) establish procedures to provide financial assistance for representatives to the Conference who are unable to pay their own expenses;

(4) establish such regulations as are necessary to carry out the provisions of this Act;

(5) designate such additional representatives to the Conference as may be necessary and appropriate to fulfill the goals set forth in section 3(b) of this Act;

(6) grant technical and financial assistance by grant, contract, or otherwise to facilitate the organization and conduct of State and regional meetings in preparation for the Conference;

(7) establish such advisory and technical committees as the Commission considers necessary to assist and advise the Conference; and

(8) publish and distribute the report required under this Act.

9. Acute concern that any funds appropriated to the Commission would be misused for improper purposes surfaced during the hearings in both Houses. Representative Miller offered to substitute for the ban on use of appropriate funds for lobbying activities the following proviso:

That none of the funds appropriated under this paragraph shall be used for the purpose of directly or indirectly influencing the passage or defeat of any piece of legislation before any legislative body including the ratification of any Constitutional Amendment. This amendment was ultimately rejected by both Houses in favor of the less restrictive "lobbying activities" language.

Moreover, during the course of the debate an opponent of the appropriation read into the Congressional Record the entire complaint filed by plaintiffs in this lawsuit. See 122 Cong.Rec. S6918–S6919 (daily ed. May 10, 1976).

10. Article V provides in pertinent part:

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress. . . .

11. Pub.L. No. 92–463, U.S. Code Cong. & Admin.News 1972, p. 892 (Oct. 6, 1972). Section 5 of the Act provides, in part:

&ast; &ast; &ast; &ast; &ast; &ast;

(b) In considering legislation establishing, or authorizing the establishment of any advisory committee, each standing committee of the Senate and of the House of Representatives shall determine, and report such determination to the Senate or to the House of Representatives, as the case may be, whether the functions of the proposed advisory committee are being or could be performed by one or more agencies or by an advisory committee already in existence, or by enlarging the mandate of an existing advisory committee. Any such legislation shall—

(1) contain a clearly defined purpose for the advisory committee;

(2) require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee;

providing for a fair balance of viewpoints among members of the ERA and abortion questions.

Plaintiffs specified three alternative requests for relief. First, plaintiffs requested judicial termination of the Commission and an order requiring its members "to refund to the Treasury of the United States all funds spent for ratification of the Equal Rights Amendment, for opposition to a constitutional amendment limiting abortion, and for 'lobbying activities.'" Alternatively, plaintiffs desired to enjoin the Commission from perpetrating the constitutional and statutory violations detailed in the complaint. Finally, plaintiffs sought to compel appointment of persons to the Commission whose viewpoints on the ERA and abortion questions would make the Commission "fairly balanced." [12]

In response to the Commission's Motion for Judgment on the Pleadings, plaintiff Mulqueeny executed an affidavit which identified herself and plaintiff Boehnke as chairpersons of the Illinois branch of "Stop ERA," an organization keenly and actively opposed to the ratification of the proposed Equal Rights Amendment. Plaintiffs claimed to be threatened by immediate, irreparable injury as a consequence of Commission functioning, stating that:

5. For the past four years, Plaintiffs have spent much time, effort, and personal funds in planning, leading, organizing, and carrying out educational work in the State of Illinois to show the harmful effects of the Equal Rights Amendment. Plaintiffs have performed this educational work in various organizations, in schools and colleges, in the press and media, at State of Illinois legislative hearings, at churches, and at many meetings in various parts of Illinois. Plaintiffs have built up a large organization of thousands of citizens who have traveled to the State Capitol at their own expense on many occasions to oppose ratification of the Equal Rights Amendment.

6. Plaintiffs are now in imminent danger of having their four years of time and effort in this educational campaign wiped out, their organization destroyed, the good will and credibility they have built impugned, and their five years of legislative victories taken away from them, because of Defendant's illegal actions.

The district court found that plaintiffs had standing to sue for the relief requested, and after hearing testimony, determined that the Commission's programs supporting ERA constituted "lobbying activities." [13] The court enjoined the Commission and its members from participating in the following activities *pendente lite*:

(1) engaging in lobbying activities of any kind, (2) using, directly or indirectly for lobbying activities, any funds appropriated to said defendant to promote the passage or defeat of any legislation, or the adoption, ratification, or defeat of any proposed Constitutional amendment by any legislative body, and (3) using any meetings or women's conferences called or sponsored by it, directly or indirectly, to promote the passage, ratification, or defeat of any such proposed legislation or

---

(3) contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment.

12. An amended complaint, filed subsequent to the Congressional appropriation of funds to the Commission, reiterated these allegations and additionally sought a temporary injunction "ordering the Defendant Commission to refrain from spending any of the $5,000,000 appropriated . . . until Defendant . . . and all subcommittees and subgroups . . . are in compliance with the Federal Advisory Committee Act."

13. The district court did not consider the purported violations of Article V of the Constitution and the Federal Advisory Committee Act. Plaintiffs appeal from the district court's failure to rule upon the applicability of the Federal Advisory Committee Act.

Constitutional amendment by any legislative body.

App. at 145.

Defendant appeals from the issuance of this preliminary injunction.

## II

According to their complaint, plaintiffs challenge defendant's activities under the Administrative Procedure Act, alleging illegality in the Commission's putative violation of the Federal Advisory Committee Act, the statutory prohibitions against the use of appropriated funds for "lobbying activities" and Article V of the United States Constitution. For purposes of assessing plaintiffs' standing to maintain this litigation, we deem these allegations to be true.

Despite the conceptual vagaries attendant to the doctrine of standing, as well as Mr. Justice Douglas' admonition that "[g]eneralizations about standing to sue are largely worthless as such," [14] it is settled that "the gist of the question of standing" involves an inquiry into whether the litigant has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions". *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). A litigant who asserts that he is "aggrieved by agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702, must at the outset demonstrate, as an irreducible minimum, that he has sustained "injury in fact," [15] *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970),[16] and that the grant of judicial relief requested will ameliorate the complained-of harm. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Plaintiffs' complaint fails to comport with either requirement.

*Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), is instructive in the determination of whether plaintiffs allege a legally cognizable injury. In that case, the Sierra Club, a membership corporation holding "a special interest in the conservation and sound maintenance of the national parks, game refuges, and forests of the country," *id.* at 730, 92 S.Ct. at 1364, sought declaratory and injunctive relief in order to restrain federal officials from approving a proposed plan for development of the Mineral King Valley. In assessing the standing of the Sierra Club to pursue its claim, the Court concurred in the proposition that a litigant may assert values other than economic in order to fulfill the requirement that "injury in fact" be alleged, but cautioned that "broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." *Id.* at 738, 92 S.Ct. at 1368. Despite the Sierra Club's long "commitment to the cause of protecting our Nation's natural heritage from man's depreda-

**14.** *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 828, 25 L.Ed.2d 184 (1970).

**15.** The requirement of alleging an "injury in fact" is obviated in situations where Congress has enacted a specific statute authorizing invocation of the judicial process. *See e.g., Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968); *Scripps-Howard Radio, Inc. v. F.C.C.*, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1962). However, the legislative history of neither the Federal Advisory

Committee Act nor of the provisions of Public Laws 94–167 and 94–303 prohibiting expenditure of appropriated moneys for "lobbying activities" manifests an intent, either express or implied, to create a right of enforcement in private citizens.

**16.** *See also Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d, 192 (1970); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970).

tions," *id.* at 739, 92 S.Ct. at 1368, the Court concluded that the Sierra Club lacked standing because involvement with an issue, whether on the part of an organization or an individual, without more, is insufficient to satisfy the constitutional essential of "injury in fact." *Id.* at 739-40, 92 S.Ct. 1361.

The "injury in fact" alleged by plaintiffs Mulqueeny and Boehnke is threatened loss of the benefits of legislative victories concerning a pressing current issue, gains reaped at the price of the expenditure of time, energy and funds on the part of plaintiffs. Manifestly, this imminent "injury" must be interpreted in actuality as a potential that the efforts employed by plaintiffs toward their goal of defeating legislation concerning ratification of the Equal Rights Amendment might ultimately prove fruitless, should the position they advocate not prevail. Certainly plaintiffs' endeavors on behalf of their cause bespeak their interest in the Commission's functioning, in the sense that defendant's plans and proposals are antagonistic to plaintiffs' theories regarding womens' rights. However, the thrust of recent Supreme Court decisions underscores the principle that "mere interest" in the resolution of an issue, no matter how compelling, no matter how vigorously and vocally expressed, is of itself inadequate as a substitute for the Article III requirement that a litigant demonstrate personal, concrete injury. *Sierra Club, supra; United States Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). *Cf. Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Roe v. Wade,* 410 U.S. 113, 127-29, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

*SCRAP, supra,* relied upon by plaintiffs, illuminates proper application of the principle delineated in *Sierra Club.* Plaintiffs in that case challenged a surcharge on virtually all railroad freight rates authorized by the Interstate Commerce Commission, asserting that adoption of the proposed rate structure would discourage the use of recyclable materials, and thereby adversely affect the environment. Plaintiffs alleged specific injury in that their actual use and enjoyment of natural resources and recreation areas would be directly impaired. The Court determined this allegation a sufficient injury for standing purposes, distinguishing *Sierra Club* as involving "a vehicle for the vindication of value interest of concerned bystanders," *SCRAP, supra,* 412 U.S. at 687, 93 S.Ct. at 2416, rather than concrete and perceptible injury. The *SCRAP* plaintiffs alleged a threat of actual harm to their environmental and esthetic interests, as opposed to the abstract concern regarding environmental protection issues voiced by the Sierra Club. *See also Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

Any energy, funds or time disbursed by plaintiffs is concomitant to their keen concern regarding the fate of legislation seeking the ratification of ERA. Any alleged loss incurred by plaintiffs therefore constitutes an abstract injury, not judicially cognizable in the assessment of plaintiffs' standing.

Moreover, assuming *arguendo* that plaintiffs' allegations of harm establish "injury in fact," plaintiffs lack standing to invoke the jurisdiction of the federal court in that only through reliance upon the most speculative inferences is a relationship between defendant's conduct and plaintiffs' claimed harm apparent. It is wholly conjectural whether the exercise of remedial powers possessed by the federal court, as desired by plaintiffs, would result in the maintenance of the status quo in the Illinois legislature's posture on the issue of ratifying the Equal Rights Amendment. It is highly plausible that the Commission's proposed course of conduct would have no impact on a legislative determination to disfavor ratification of the proposed amendment; it is equally plausible that, were the injunctive relief requested by plaintiffs granted, the legislature would nevertheless elect to ratify the ERA. Plaintiffs cannot establish that the harm they assert is fairly attributable to the Commission's functioning, or that the

grant of injunctive relief will remedy the alleged injury. Thus, plaintiffs' reliance on merely "the remote possibility, unsubstantiated by allegations of fact, that their situation might [be] better had [defendant] acted otherwise, and might improve were the court to afford relief," *Warth, supra,* 422 U.S. at 507, 95 S.Ct. at 2209, is insufficient to assure that plaintiffs would realize a benefit from judicial intervention. *Eastern Kentucky Welfare Rights Organization, supra; Linda R.S., supra.*

The fact that denying these plaintiffs standing to litigate the legality of the Commission's activities because plaintiffs cannot establish a cognizable injury which is a consequence of defendant's conduct, precludes other individuals from mounting an effective challenge is of no moment. Standing to sue does not affix itself to a litigant who does not possess it merely because no other individual is willing or able to vindicate a claim. Rather, the Supreme Court has aptly declared that:

> Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls. Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them.

*United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 2948, 41 L.Ed.2d 678 (1974). Protection against the harm asserted accrues to plaintiffs through the political, not the judicial, process. *Schlesinger, supra,* 418 U.S. at 227, 94 S.Ct. 2925.

In view of this resolution of the standing issue, it is unnecessary to consider the remaining issues. Accordingly, the judgment of the district court is vacated, and this case is remanded to the district court with directions to dismiss for lack of standing.

Vacated and Remanded.