**William W. WINPISINGER et al., Appellants**

v.

**Jack WATSON, Secretary of the Cabinet and Assistant to the President for Intergovernmental Affairs et al.**

**No. 80–1160.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 1980.

Decided April 10, 1980.

Joseph L. Rauh, Jr., Washington, D. C., with whom John Silard, William A. Dobrovir, Washington, D. C., and Erwin Chemerinsky were on brief, for appellants.

Paul Blankenstein, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Robert E. Kopp and Anthony J. Steinmeyer, Attys., Dept. of Justice, Washington, D. C., were on brief for appellees, Watson, Secretary of the Cabinet & Assistant to the President for Intergovernmental Affairs, et al.

William R. Glendon, Washington, D. C., with whom Anthony F. Essaye, Jerry W. Markham, Timothy G. Smith and Robert B. Barnett, Washington, D. C., were on brief, for appellee, Carter-Mondale Presidential Committee, Inc.

Before ROBINSON and MacKINNON, Circuit Judges, and AUBREY E. ROBINSON, Jr.*, United States District Judge for the District of Columbia.

Opinion PER CURIAM.

PER CURIAM.

Appellants, supporters of Senator Edward M. Kennedy in his quest for the Presidential nomination of the Democratic Party,[1] appeal from the dismissal by the district court of their action alleging that the defendants, members of President Carter's administration[2] and the Carter-Mondale

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Appellants are William W. Winpisinger, Patsy T. Mink, Vincent L. Connery, Julian Bond, Mareo Dellaca, Loren Callendar, and Edward DeSautel. Appellants Mink and Callendar allege that additionally they are candidates for seats as delegates to the 1980 Democratic National Convention.

2. The individual defendants are Jack Watson, Secretary of the Cabinet and Assistant to the President for Intergovernmental Affairs; Hamilton Jordan, Assistant to the President and Chief of the White House Staff; Frank Moore, Assistant to the President for Congressional Liaison; Jody Powell, Press Secretary to the President; Stuart Eizenstat, Assistant to the President for Domestic Affairs and Policy; Sara Weddington, Assistant to the President; Ann Wexler, Assistant to the President; Neil

Committee, have illegally employed their public authority and expended federal funds to promote the President's renomination. Appellants contend that this results in constitutional violations by diminishing the effect of their efforts for Senator Kennedy. They accordingly seek declaratory and injunctive relief against the practices detailed in their complaint.

The district court, in an order dated February 7, 1980,[3] and an accompanying memorandum opinion,[4] dismissed the complaint for lack of standing by appellants to bring the action.

We affirm, both on the basis of lack of standing and on the ground that prudential considerations would preclude the court from exercising jurisdiction in any event.

## I. THE COMPLAINT

Appellants, plaintiffs in the district court, are seven of Senator Kennedy's supporters. The appellees, defendants in the district court, are seven Cabinet Officers, seven Presidential assistants, and the Carter-Mondale Presidential Committee, the principal campaign committee supporting the renomination candidacy of President Carter. The gravamen of appellants' allegations is capsulized in the introductory paragraph to their complaint:

> This is an action for declaratory judgment and injunction against defendants' misuse of federal power and federal funds to purchase the Presidential renomination of Jimmy Carter, impairing the operation of the Nation's elective process embodied in the Constitution and injuring plaintiffs' constitutional rights under the First and Fifth Amendments, as voters,

contributors and participants in the process of Presidential nomination. Defendants are Presidential subordinates engaged in a concerted course of conduct designed to use the public treasury for salaries, travel expenses, costs of meetings and other political outlays; to grant and withhold public employment based upon political support by the employee; and to promise and award federal programs and funds to communities as political inducements and rewards, all in order to obtain support for President Carter's renomination. Defendants' course of conduct, using the federal treasury to buy renomination, threatens the integrity of our democratic system of government and debases the election of the highest public official in the land.[5]

Although the appellants' 33-page complaint details numerous allegations in support of this general contention, a few specific examples, abstracted from the complaint, will provide a basis for a fuller understanding of the precise nature of the charges made against the defendants, and of our disposition of this appeal.

Appellants contend, for example, that defendant Jordan said that federal employees who were not barred from political activity by federal law are expected to perform political activities only for President Carter and that anyone in that category supporting Senator Kennedy would be dismissed.[6] Similarly, President Carter is alleged to have instructed the defendant members of his Administration to require their subordinates who were outside of the protection of the Civil Service Merit System to support

---

Goldschmidt, Secretary of Transportation; Moon Landrieu, Secretary of Housing and Urban Development; Patricia R. Harris, Secretary of Health, Education and Welfare; Cecil D. Andrus, Secretary of the Interior; Bob Bergland, Secretary of Agriculture; Ray Marshall, Secretary of Labor; and Philip M. Klutznick, Secretary of Commerce.

Each of the individual defendants is sued in his or her official capacity. Complaint, ¶¶ 4-5, Joint Appendix (JA) 13.

Although President and Mrs. Carter, and Vice President Mondale also are named as among those who have committed allegedly

unlawful acts, they are not defendants in this action.

3. JA 43.

4. JA 44–47.

5. JA 10.

6. Complaint ¶ 13, JA 17. Such dismissals would be unconstitutional under the recent decision in *Branti v. Finkel*, 48 U.S.L.W. 4331 (U.S. March 31, 1980). *See* n. 27, *infra*.

his candidacy or suffer the threat of dismissal for refusing to do so.[7]

Several types of charges dealing with the alleged misuse of federal funds are also made. The defendant federal officials are alleged to have used their time during normal working hours, for which time they are paid out of the federal treasury for their work as federal officials, on trips made and activities conducted for the principal purpose of promoting President Carter's renomination campaign.[8] Allegations are also made that on trips taken for campaign purposes only partial reimbursement to the federal treasury was made, if at all, and only after the trip was actually taken. This delay in making reimbursement acts, according to the complaint, as an interest free loan by the treasury to the Carter-Mondale Committee.[9]

Similarly, the allegation is made that federal funds are being used to publish materials favorable to the President. For example, defendant Wexler is alleged to have had thousands of copies of a 49-page pamphlet entitled "The Record of President Carter's Administration" printed and mailed at federal expense. The purpose for this pamphlet is alleged to be the generation of support for the Carter campaign.[10] Defendant Weddington is alleged to have mailed 6,200 copies of a letter and glossy poster displaying 100 photographs of women appointees in the Carter Administration two days after Senator Kennedy criticized "the Carter position concerning women" in a speech.[11] Other allegations in the complaint contend that Kennedy supporters were not invited to attend Presidential functions,[12] or to travel on the President's aircraft "Air Force One" because of their preference for Senator Kennedy.[13]

Political patronage in hiring is also contained in the allegations of the complaint; the defendant federal officials are alleged to have hired federal employees on the basis of political affiliation. For example, appellants contend that the 275,000 people to be hired to take the 1980 census are to be chosen on the basis of "patronage conferred upon those political figures who had or would support the Carter candidacy."[14] Appellants also identify the resignation of an Ambassador as a consequence of refusing to support the President's renomination and instead supporting Senator Kennedy.[15] Along the same lines, another person is alleged to have had the suggestion made to him that he would receive favorable consideration for a high federal appointment as a reward for his supporting the Carter candidacy.[16]

Finally, appellants contend that the granting of federal funds to states and cities has been conditioned upon officials of those entities supporting the Carter candidacy,[17] and that the timing of the announcement of federal grants has been coordinated to provide the maximum benefit to President Carter's renomination campaign. As a corollary to this allegation, appellants charge that in areas where official support has been for Senator Kennedy, assistance has been denied.[18]

Collectively, appellants contend that the use by the defendant federal officials of the resources of the federal government provide the Carter-Mondale Committee with federal support. This, in turn, is alleged to harm appellants in four distinct ways. As supporters of Senator Kennedy, they charge that the challenged actions violate their First Amendment right to "free expression

7. Complaint ¶ 14, JA 17–18.

8. Complaint ¶ 17, JA 19.

9. Complaint ¶ 16, JA 19.

10. Complaint ¶ 20(a), JA 22–23.

11. Complaint ¶ 20(b), JA 23.

12. Complaint ¶¶ 20(c)(d), JA 23.

13. Complaint ¶ 20(e), JA 24.

14. Complaint ¶ 22, JA 24.

15. Complaint ¶ 23, JA 25.

16. Complaint ¶ 24, JA 25.

17. Complaint ¶¶ 25–51, JA 25–36.

18. Complaint ¶¶ 35–37, JA 31–32.

and free association in the electoral process in support of their preferred candidates." As voters, they argue that these practices are alleged to "diminish, dilute and nullify plaintiffs' votes, plaintiffs' lawful contributions of money, and their other efforts to nominate the candidates of their choice." [19]

As contributors to Senator Kennedy's campaign they claim infringement of a right to effectiveness of their contributions equal to those of President Carter's supporters. And two appellants, candidates for delegate seats at the Democratic National Convention, assert that the conduct complained of has lessened their chances of selection.[20]

In addition, appellants assume several more general positions. Violation of appellants' rights to equal protection of the laws, secured by the Fifth Amendment, is alleged to occur by defendants "depriving plaintiffs of an equal voice in the Democratic Presidential nomination process by their use of the federal treasury and federal power in support of the Carter nomination." [21] And violations of laws relating to the election process, appropriations and the legislative authority of Congress are also alleged.[22]

Appellants request injunctive and declaratory relief against the practices complained of.[23]

## II. STANDING

■ The district court dismissed this action for lack of standing. The court did not reach, for that reason, the issue of whether prudential considerations would also bar plaintiffs' claims. Although we affirm the dismissal, we do so on the basis of both lack of standing and prudential concerns. As our discussion on these issues reflects, we do not consider these two concepts to be clearly severable in this case; consequently, we rely upon both grounds for our affirmance.

### A

Standing is an absolute condition which the plaintiff must meet in order to maintain an action. "Standing doctrines are employed to refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination." [24]

The district court held that the plaintiffs failed to demonstrate standing because they failed to allege a "distinct and palpable injury" to themselves, quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) which is direct and concrete, and not abstract, remote or speculative, citing *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). The court further held that plaintiffs must establish an injury "that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the Court," citing *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–1926, 48 L.Ed.2d 450 (1976) and *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).[25] In conclusion the court found that the plaintiffs' inability to influence the election process or to induce support for Senator Kennedy may turn on "a number of factors that are unrelated to defendants' alleged abuses." This variety of factors operating on the electorate at any given time would require extreme speculation to establish a relationship between the defendants' alleged conduct, and the plaintiffs' injury.[26]

---

19. Complaint ¶ 54, JA 37.

20. Complaint ¶¶ 3(b), 3(f), 59, JA 11, 12, 30–31.

21. Complaint ¶ 55, JA 37–38.

22. Complaint ¶¶ 55–58, JA 38–39.

23. Complaint ¶¶ 60–63, JA 41–42.

24. 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3531 at 175–76 (1975).

25. Mem.Op. at 2, JA 45.

26. Mem.Op. at 4, JA 47.

The court also held that the appellants' allegations do not bring them within the Supreme Court's reapportionment cases, a series of opinions, beginning with *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961), in which the Supreme Court premised standing to sue on allegations of a direct, tangible injury to the plaintiff's voting rights. In *Baker* the injury consisted of the inequality of an individual's vote who lived in a "disfavored" county, which resulted in a "gross disproportion of representation to voting population." 369 U.S. 207, 82 S.Ct. 705. Nor did the district court find the injury complained of similar to that in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) where a policy of patronage which resulted in the dismissal of public employees, within a specified group, who failed to support the incumbent party was held invalid.[27] Additionally, the district court noted that the opinion by the United States Court of Appeals for the Seventh Circuit in *Shakman v. Democratic Organization of Cook County*, 435 F.2d 267 (1970), *cert. denied*, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971), was implicitly modified by that Circuit's opinion in *Mulqueeny v. National Commission on the Observance of International Women's Year*, 549 F.2d 1115 (1977).

In sum, the district court concluded that the appellants had failed to show either injury in fact to themselves or a causal connection between the injury and the defendants' conduct. While *part* of the conduct complained of is a matter of public knowledge, the intent of the parties and the consequences of their acts upon appellants are open to question and wide speculation and we agree with the conclusions of the district court.

### B

■ Although the determination of whether there is an injury which will support appellants' standing is necessarily determined on an *ad hoc* review of the facts in each case, *Harrington v. Bush*, 553 F.2d 190, 206 (D.C.Cir.1977), and while generalizations about standing are "largely worthless as such", *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970),

> "the *basic concern* of the standing doctrine is that *the individual complaining party have such a strong connection to the controversy that its outcome will demonstrably cause him to win or lose in some measure.*" *Harrington v. Bush, supra*, 553 F.2d at 206 (emphasis in original).

Appellants here identify the harm which they have suffered as the dilution of their efforts on Senator Kennedy's behalf by the actions of the federal defendants in utilizing the vast resources available to the Administration to promote President Carter's quest for renomination. Necessarily, appellants conclude, there is a causal connection between the actions they allege the federal defendants have taken and the injury they allege. We cannot agree that there is either an irresistible or a legally sufficient connection between these matters.[28]

Whether phrased as "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of [the] issues," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1961), the existence of a "distinct and palpable injury," *Gladstone, Realtors v. Village of Bellwood*, 441

---

**27.** While appellants do not have standing to contest allegedly threatened discharges for refusal to support President Carter, individual employees who are affected may be entitled to relief absent "demonstrat[ion] that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, ——, 100 S.Ct. 1287, 1297, 63 L.Ed.2d 574 (1980).

**28.** This action was filed prior to Senator Kennedy's New York, Massachusetts, and Connecticut primary victories of which we take judicial notice, including the publicized "promises" that massive financial aid to New York would continue. F.R.Ev. 201(b), (f). Those primary wins underscore the fallacy of merely assuming an adverse impact upon Kennedy supporters from the activities charged in the complaint.

U.S. 91, 114, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1978), quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1974), or a "[c]oncrete injury, whether actual or threatened, [which] is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution," *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1973), the appellants must demonstrate that the "asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin, supra,* 422 U.S. at 505, 95 S.Ct. at 2208.

Put another way, one of the ingredients indispensable to standing is "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Env. Study Group, supra,* 438 U.S. at 72, 98 S.Ct. at 2630 (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977)). The endless number of diverse factors potentially contributing to the outcome of state presidential primary elections, caucuses and conventions forecloses any reliable conclusion that voter support of a candidate is "fairly traceable" to any particular event. In the case before us, whether an appellant is viewed in the character of a voter, contributor, a noncontributing supporter or a candidate for a delegate post, a court would have to accept a number of very speculative inferences and assumptions in any endeavor to connect his alleged injury with activities attributed to appellees. Courts are powerless to confer standing when the causal link is too tenuous. *Linda R.S. v. Richard D.,* 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 793 (1972); *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 45, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976).[29]

We thus conclude that appellants have failed to carry their burden to demonstrate the causality prerequisite to standing and we feel that appellants could not obtain effective relief from the courts for the reasons we discuss in part III of this opinion, *infra.*

We hold, then, that appellants lack standing to maintain this action.

### III. PRUDENTIAL BARRIERS

Although the district court declined to address the question of whether prudential considerations would also preclude maintenance of this action, we feel that they are inextricably linked to the question of standing in this case. In the statement of facts, we have detailed the nature of appellants' allegations against the defendants, which will not be repeated here. A fair characterization of the accusations would necessarily include the observation that they relate, quite literally, to virtually every discretionary decision made by the Administration acting through these high government officials. Consequently, any relief, to be effective, would have to be as broad as the authority of the high offices held by the federal defendants. Whether shaped as declaratory relief, or injunctive relief, or both, the court's judgment would have to interject itself into practically every facet of the Executive Branch of the federal government, on a continuing basis, for the purpose of appraising whether considerations other than pure public service motivated a particular defendant in the performance of his or her official duties.

Prudential barriers upon courts clearly preclude judicial interference in the daily responsibilities of these defendants and the resultant shift of such decisionmaking from

---

**29.** *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258 (D.C. Cir., 1980) addressed a situation similar to the one we find here: a failure to allege facts showing a substantial likelihood that a grant of the relief sought would redress the plaintiff's asserted injuries, resulting in a holding that the plaintiffs lacked standing to bring the action. In *Greater Tampa* the relief requested by the plaintiff—better air service—could be obtained only by the consent of the government of the United Kingdom. Plaintiffs consequently failed to meet the standing requirement of demonstrating a justiciable controversy.

the Executive to the Judicial Branch. In the most basic sense, prudential barriers developed as an adjunct to standing to restrict the courts to their appropriate ambit. The judiciary is not to act as a management overseer of the Executive Branch. In *Public Citizen, Inc. v. Simon*, 539 F.2d 211, 217 (D.C.Cir.1976) we ruled that taxpayer standing did not exist where

> appellants' challenge can be characterized as regulatory in aim—to compel an accounting by White House officials of the time spent on campaigning as opposed to official duties—and the "executive spending" on the salaries of the White House Staff members merely an incidental feature.

539 F.2d at 217. If standing were found here the result would also be "regulatory." Standing, in both its constitutional and prudential dimensions, is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin, supra*, 422 U.S. at 498, 95 S.Ct. at 2205. This concern is sharpened when it would bring two coordinate branches of the government into conflict. *Schlesinger v. Reservists To Stop The War, supra*, 418 U.S. at 222, 94 S.Ct. at 2932.[30]

Providing the requested relief would unquestionably bring the court and the Executive Branch into conflict because the court would be placed in the position of evaluating every discretionary consideration, including those which result in a decision not to take a particular action, for traces of political expediency. This would necessarily require the court to determine how the particular matter would be resolved if detached from the political consequences to President Carter's renomination efforts. As the factual statement in this opinion reflects, the sweeping breadth of complaint would require correspondingly broad relief. The courts are not suited to undertake a neutral consideration of every Executive action, ranging from White House invitations and space reservations on the Presidential aircraft to the decision to award funds to a particular state or other political subdivision for general or specific projects.[31]

*Elrod v. Burns, supra,* and *Shakman v. Democratic Organization of Cook County, supra,* are not inconsistent with this holding. In *Elrod* a patronage process which resulted in a dismissal from public employment on the basis of political affiliation was held invalid. Justice Brennan, in his plurality opinion, noted that neither the political question nor the separation of powers doctrines precluded consideration of the case because they arose only in the context of

---

30. *See also* Justice Powell's concurring statement in *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533–35, 62 L.Ed.2d 428 (1979)· dealing with the question of whether the President could unilaterally abrogate a treaty with the Republic of China (Taiwan). Although Justice Powell would have dismissed the complaint as not ripe for judicial review, he also outlined the considerations, which he did not find present in *Goldwater*, relating to the prudential concerns "calling for mutual respect among the three branches of government." *Id.*, 100 S.Ct. at 535. Justice Powell did not feel the constitutional interpretation required, if the case were ripe, implied any lack of respect for a coordinate branch of government.

But for this court to undertake the inquiry which would be required in this case would be to invade the far corners of the Executive Branch by subjecting countless Administration decisions to judicial scrutiny for any vestige of political motivation. That action would necessarily carry with it an implied lack of respect for a coordinate branch of government, in addition to being unmanageable. Neither would

that inquiry proceed on the basis of a discrete judicial standard, the situation Justice Powell described as being present in *Goldwater*. Rather the court would be assessing the correctness of an action assigned to the Executive Branch and often requiring substantial supporting personnel and expertise, as well as a significant time investment. The review which appellants seek is not even remotely related to that ordinarily undertaken by the judiciary.

31. A case presents a nonjusticiable question when there is "a lack of judicially discoverable and manageable standards for resolving it." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). See also *Gilligan v. Morgan*, 413 U.S. 1, 8, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407 (1973); *Coleman v. Miller*, 307 U.S. 433, 454–455, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939); *Goldwater v. Carter*, 444 U.S. 996, 997, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring in the judgment); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978).

the Court's relationship with a coordinate branch of the federal government, not the states. Obviously, that is not the situation here where coordinate branches of government are directly involved. Additionally, the abuses alleged in *Elrod* were far more concrete and did not involve the element of discretion which is so pronounced in this appeal. And see note 27 *supra.*

And while we accord due respect to the Seventh Circuit's opinion in *Shakman, supra,* we find it distinguishable from the case at bar.[32] *Shakman* accorded standing to an independent candidate, and a supporter, to challenge alleged abuses which utilized the incumbent party's position to use a system of coercing political activity through the threat of arbitrary dismissal for failure to participate. *Shakman* dealt with an identifiable system of abuses, involving a single County, not a coordinate branch of the federal government. Additionally, the district court, on remand, was aided by a consent judgment entered into by a number of the defendants. The district court left open, for further developments, the remedy to be applied in *Shakman.*

 It is axiomatic that the request for declaratory relief is discretionary with

the court, and that the request should be denied where "it will not terminate the controversy or serve a useful purpose."[33] As Chief Justice Warren remarked in *Zemel v. Rusk,* 381 U.S. 1, 19, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965):

> However, the Declaratory Judgment Act, 28 U.S.C. § 2201 (1958 ed.), 'is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.' *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241 [73 S.Ct. 236, 239, 97 L.Ed. 1368].

In keeping with the Constitution's separation of powers of the three branches we elect to exercise such discretion by refusing to hear this case which would set a precedent by placing the judiciary in the middle of myriads of fundamental decisions that the framers of the Constitution considered they were vesting in the executive branch of government. Similarly, an injunction must be drawn with sufficient specificity to remedy the harm shown. *Aviation Consumer Action Project v. Washburn,* 535 F.2d 101, 108 (D.C.Cir.1976). The relief which appellants request would be so broad as to cause judicial intrusion into virtually every facet of the Executive Branch; narrower relief would be ineffective.[34]

**32.** We note that *Shakman* was a 2–1 decision, Judge Swygert dissenting on the ground of inappropriateness of judicial intervention, the thesis we maintain here. We also note that *Shakman* was decided in 1970, prior to many of the Supreme Court opinions reassessing the standing requirement, e. g. *O'Shea v. Littleton, supra, Warth v. Seldin, supra, Simon v. Eastern Kentucky Welfare Rights Org., supra,* and *Duke Power Co. v. Carolina Env. Study Group, supra.* A recent standing case decided by the Seventh Circuit, *Mulqueeny v. National Commission on the Observance of International Women's Year, supra,* although not directly comparable with *Shakman* suggests, a tightening of the standards for determining standing. It should also be noted that unlike the government employees in *Shakman,* the defendants here have no fixed hours, are not paid on an hourly basis and their working day is largely within their own discretion.

**33.** E. Borchard, *Declaratory Judgments* 135 (2d ed. 1941). Because declaratory relief is often a predicate to injunctive relief, *Powell v. McCormack,* 395 U.S. 486, 499, 89 S.Ct. 1944, 1952, 23 L.Ed.2d 491 (1968), it should be drawn with

sufficient precision to identify the specifics of any unlawful practice so as to provide a basis for the entry of an injunction, should one follow. Additionally, declaratory relief, to be effective, must be phrased with precision in any event or it does not meet the needs of the parties and consequently would not resolve the dispute underlying the action.

**34.** The fact that the Federal Election Campaign Act of 1971 was modified by the Federal Election Campaign Act Amendments of 1979, Pub. L.No.96–187, 93 Stat. 1339, to remove the spending of appropriated funds from the definition of "expenditure," and thus from the reach of the reporting and penalty provisions of the Act, 2 U.S.C. §§ 434(a), 441j, does not support judicial review of these allegations as the legislative history explains that the change was made because "[m]isuse of appropriated funds is a violation of Federal law and subject to enforcement by other agencies" than the Federal Election Commission. H.R.Rep. No. 96–422, 96th Cong., 1st Sess. (1979), U.S.Code Cong. & Admin.News 1979, p. 2860. The use of the words "other agencies" suggests that actions of

Consequently, not only a lack of standing, but also prudential limitations, bar this action.

We affirm the order of the district court dismissing the action.

*So ordered.*

this kind were *not* contemplated to remedy violations. The Congress and the electorate also have a role in correcting such abuses.