**NATIONAL COAL ASSOCIATION,
Plaintiff,**

v.

**Ray MARSHALL, Secretary, United
States Department of Labor, et
al., Defendants.**

**Civ. A. No. 80–2321.**

United States District Court,
District of Columbia.

March 23, 1981.

John L. Kilcullen, Charleston, W. Va., Washington, D. C., for plaintiff.

Andrew M. Wolfe, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This case is before the Court on defendants' ripe motion to dismiss the case. Defendants have alleged several grounds for dismissal. The Court finds that it lacks jurisdiction because plaintiff's claims are not justiciable, and does not reach the merits of the remaining grounds.

### I.

Plaintiff is an association which represents coal mine operators. Plaintiff alleges that the defendants' administration of the Black Lung Benefits Program (the Program) has resulted in the improper granting of benefits to tens of thousands of claimants. Plaintiff asks this Court to undertake a massive review of the manner in which the defendants administer the Program which pays over a billion dollars per year in benefits to thousands of coal miners and their families out of a special fund called the Black Lung Disability Trust Fund (the Fund).

The original Black Lung Benefits Act became a law in 1969. Its stated purpose was to

Provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease; and to ensure that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis.

Title IV, Federal Coal Mine Health and Safety Act. 30 U.S.C. § 901, et seq.

Experiences under the 1969 Act during the 1970's indicated that adequate benefits were not being provided to those who suffered from black lung. Accordingly, Congress passed amendments in 1972 and 1977 which significantly liberalized benefit entitlement and expedited the claims adjudication process.[1] Congress reformed evidentiary and eligibility requirements, gave broad authority to the Secretary of Labor to develop and promulgate appropriate medical criteria for filed claims, eliminated certain restrictions on the filing of claims, and established penalties to be imposed on

1. Black Lung Benefits Act of 1972, P.L. 92-203; Black Lung Benefits Reform Act of 1977, P.L. 95 239; and Black Lung Benefits Revenue Act of 1977, P.L. 95-227.

coal mine operators for failure to meet their obligations. In 1977, Congress directed that all of the previously pending and denied claims should be revaluated under the new medical criteria. 30 U.S.C. § 945.

The 1977 amendments also created the Fund in order to transfer more of the responsibility for black lung benefit payments from the federal government to the coal industry. With minor exceptions all black lung benefit claims are paid by an individual coal mine operator (operator claim) or by the Fund (Fund claim). The Fund is primarily available to pay the claims of miners whose coal mine employment terminated before January 1, 1970, or whose employment terminated thereafter but for whom a responsible coal mine operator cannot be identified, or for whom a responsible coal mine operator has been identified but operator declines to make payment upon an approved claim within 30 days. 30 U.S.C. § 934(a)(1) and (2).

A coal excise tax finances the Fund. Coal mine operators must pay a tax of 50 cents per ton of coal from underground mines and 25 cents per ton of coal from surface mines, not to exceed two percent of the sales price. 26 U.S.C. § 4121. If the tax payments do not match the financial obligations of the Fund, the general treasury of the United States advances money to the Fund to be repaid from future coal tax revenues with interest. The Fund has not proved self-sufficient and is nearly $2 billion in debt. Payouts now exceed expected revenues by about $500 million per year. Plaintiff fears its members will be required to make up this difference eventually.

The Secretaries of Health and Human Services, Labor, and Treasury control the Fund. The Secretary of Treasury is the managing trustee and reports to Congress annually on the condition and operations of the Fund.

Plaintiff seeks injunctive and declaratory relief and a writ of mandamus to redress alleged economic harm which has resulted from the defendants' "improper waste of assets of the . . . Fund." Amended complaint at 1–2. Specifically, the amended complaint charges that as a result of unauthorized policies, practices, and procedures,[2] defendants routinely award benefits to persons who have not established their eligibility (count one) and make overpayments of benefits (count two). Finally, plaintiff contends that plaintiff's members are beneficiaries or grantors of the Fund and that defendants' waste of the Fund's assets breaches fiduciary duties and responsibilities which defendants, as Trustees, owe plaintiff's members (count three).

### II.

Justiciability is a threshold requirement arising out of the Article III "case or controversy" clause. *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968); *O'Shea v. Littleton*, 411 U.S. 488, 493, 94 S.Ct. 669, 674, 38 L.Ed.2d 674 (1974). Claims are considered nonjusticiable where: (1) their resolution requires decisions which are not matters of judicial expertise but are matters of management, public policy or technical expertise; (2) the relief requested usurps the functions of a coordinate branch of government; or (3) the relief requested is not judicially manageable. *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); *Flast v. Cohen, supra*, 392 U.S. at 95, 88 S.Ct. at 1949.

Plaintiff asks this Court for extensive relief. To determine the veracity of count one, the Court would have to make a significant review of the tens of thousands of eligibility determinations. Similarly, count two would require this Court to study the allocational decisions made by the defendants to ascertain whether sufficient administrative resources are allocated to the investigation of approved claims and the recoupment of overpaid benefits. Count three, again, requires a detailed investigation of the Program to determine the extent, if any, of waste by the defendants.

---

2. The legality of one regulation, 20 C.F.R. § 725.701A, as amended, also is challenged. (Prayer 4).

The seventeen prayers for relief require the Court to review a substantial number of the claims filed, the priorities set by defendants in their administration of the Program, and the validity of the managerial decisions made by defendants. The first three prayers for relief ask the Court to declare unlawful the policies, practices and procedures of the Secretaries of HHS and Labor which allegedly cause federal black lung benefits to be approved on the basis of insufficient evidence. Prayers 5, 6 and 8 ask the Court to declare unlawful defendants' failure to "fully investigate" on a continuing basis claimants' receipt of black lung benefits from state or federal compensation (Prayer 5), miners' "work status and history" (Prayer 6), and the status of claimants' dependents (Prayer 8). Plaintiff further desires that every approved claim be "fully investigate[d]" (Prayer 12(b)), and asks the Court to require defendants to recover "to the fullest extent permitted by law" any excessive claim payments. (Prayer 12(c)). The Court must then order an accounting of the sums improperly expended from the Fund as a result of defendants' unlawful policies, practices and procedures and charge the unlawful disbursements against the general federal revenues. (Prayer 13). Plaintiff envisages the Court administering these requirements through "such directives and guidelines as the Court may establish." (Prayer 11).

For the Court to undertake this task is patently infeasible and an intrusion into the executive branch by the judiciary. Preparing these "directives and guidelines" would require this Court to manage the Program and its large numbers of executive branch employees who process the tens of thousands of claims. The Court would regularly have to resolve a host of managerial and public policy questions such as the following: (1) How many claims examiners should be assigned to investigate current recipients and recoup overpayments instead of processing claims applications? (2) How "fully" and how "regularly" must recipients be investigated? (3) Where is the break-even point in terms of gained savings versus increased administrative expenses in conducting these investigations and recoupment proceedings? (4) At what point will recurring investigations and recoupment efforts become so oppressive that they might deter legitimate claimants from applying for benefits? (5) Should civil service suits be brought in recoupment proceedings when the recipient will not or cannot reimburse the Fund?

The Court is not the appropriate institution to resolve the above-listed issues and set the priorities and goals of the Program. It has no authority to act as an administrative law judge or as the manager of the Program. "The judiciary is not to act as a management overseer of the Executive Branch." *Winpisinger v. Watson*, 628 F.2d 133, 140 (D.C.Cir.1980). To try this case would require such actions by the Court; it would express a "lack of respect due coordinate branches of government." *Baker v. Carr, supra*, 369 U.S. at 217, 82 S.Ct. at 710. Furthermore, the Court is not equipped to manage this type of relief. It would overly strain the resources and abilities of the judiciary to resolve the issues plaintiff raises. *Id.* at 217, 82 S.Ct. at 710. Plaintiff's concerns would be far more appropriately addressed to the Congress, which established the Program and which is primarily responsible for overseeing the operation of this important program by the executive branch.

Plaintiff argues that "this suit seeks only to require the Defendants to follow the Act and their own regulations". Opp. at 36. This end could be accomplished by the Court's issuing a "fairly simple series of guidelines and declarations." Opp. at 34. Plaintiff's basic contention that the Court need direct the defendants to follow their own regulations and do little more lacks persuasion. First, to determine if there would be a need for any relief would be a complex task that would require reviewing enormous and unwieldly amounts of data and investigating the managerial decisions of the defendants. Second, declaratory and injunctive relief must be drawn with sufficient specificity to remedy the harm done. Mere directives to defendants to follow

their own regulations issued with "fairly simple" guidelines would not resolve the disputes underlying this action. The lesser relief defendants suggest would be ineffective. *Winpisinger v. Watson, supra* at 141. Third, if the Court did issue declaratory and injunctive relief, any subsequent arguments concerning defendants' compliance would necessarily embroil the Court in the daily managerial decisions of defendants and another examination of the above-described complex data.

In accordance with the above, the Court finds that it lacks jurisdiction as plaintiff's complaint is non-justiciable. The resolution of the claims would (1) require decisions which are matters of management and public policy, (2) usurp the functions of the coordinate branches of government, and (3) not be judicially manageable.

For the foregoing reasons, the Court, this 23rd day of March 1981 dismisses the case.