**SAN JUAN AUDUBON SOCIETY et al., Plaintiffs,**

v.

**WILDLIFE SERVICES, ANIMAL AND PLANT HEALTH INSPECTION SERVICE et al., Defendants.**

**Civil Action No. 00–0785 (RMU). Doc. 61, 66.**

United States District Court, District of Columbia.

March 31, 2003.

---

Matt Kenna, Kenna & Hickox PC, Durango, CO, Robert Ukeiley, Atlanta, GA, for the plaintiffs.

Michele L. Walter, Washington, DC, for the defendants.

### *MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This action comes before the court on the parties' cross-motions for summary judgment. Plaintiffs San Juan Audubon Society, Sinapu, and Wildlife Damage Review (collectively, "the plaintiffs") are wild-life preservation groups. They allege that Wildlife Services of the Animal and Plant Health Inspection Service ("APHIS") of the Department of Agriculture and the Secretary of Agriculture (collectively, "the defendants") are violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, by failing to follow regulations when implementing the department's livestock-protection program. The defendants contend that the plaintiffs lack standing to bring this case. Because the plaintiffs' members do not have standing in their own right, and the plaintiffs therefore fail to establish associational standing, the court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment.

### II. BACKGROUND

The defendants are responsible for carrying out a program for the protection of livestock and sensitive or endangered species from animal predators. Pls.' Statement of Material Facts ("Pls.' Statement") ¶ 1; Defs.' Statement of Material Facts ("Defs.' Statement") at 1. Among the lethal methods of animal control is the M–44 cyanide-ejector device. *Id.* When placed in the ground, the M–44 device attracts animals and, when triggered, explodes a sodium cyanide capsule into the face of the animal, usually causing death. *Id.*

The Environmental Protection Agency ("EPA") imposes "use restrictions" on the use of M–44 devices pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). Pls.' Statement ¶ 2; Defs.' Statement at 1. Use Restriction No. 9 states that M–44 devices "shall not be used in areas where federally listed threatened or endangered animal species might be adversely affected." *Id.* In addition, it states that APHIS personnel ("the applicators") who place the M–44 devices in the ground "shall be issued a map, prepared

by or in consultation with the U.S. Fish and Wildlife Service, which clearly indicates such areas." *Id.*

According to the plaintiffs, the defendants have not provided the applicators with such maps. Pls.' Statement ¶ 3. The plaintiffs state that particularly when not used according to the FIFRA restrictions, the M–44 devices have killed "non-target" animals such as endangered species. *Id.* ¶ 4. In support of this statement, the plaintiffs point to the 1986 death of an endangered sandhill crane in Mississippi and the 1998 death of an endangered gray wolf in Wyoming by M–44 devices. *Id.* Other threatened or endangered species that the plaintiffs believe M–44 devices place at risk are the wolf, jaguar, lynx, bald eagle, grizzly bear, and California condor. Am. Compl. ¶ 90.

The defendants vigorously dispute the plaintiffs' conclusions, asserting that Use Restriction No. 9 requires that maps be issued to applicators only if a threatened or endangered species is located in an area and might be adversely affected by an M–44 device. Defs.' Statement at 1. The defendants note that the 1986 sandhill crane death resulted from an M–44 device placed in Mississippi by another agency, and that the 1998 death may not have involved a wolf, but a wolf hybrid. *Id.* at 2.

On April 11, 2000, the plaintiffs filed a complaint alleging that the defendants were violating the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and

regulations thereto by carrying out the M–44 program in six western and southwestern states.[1] Compl. ¶¶ 74–83. On May 9, 2000, the plaintiffs filed an amended complaint modifying their ESA claims, and adding a claim charging the defendants with violating the APA by implementing the M–44 program in an arbitrary and capricious manner. Am. Compl. ¶¶ 84–90. After discussions, the parties reached agreement on the plaintiffs' ESA claim, and at the parties' request, the court dismissed that claim on September 18, 2000.

On March 16, 2002, the defendants moved to dismiss the plaintiffs' APA claim pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). On June 19, 2001, the court denied the defendants' motion to dismiss. On April 24, 2002, after resolving issues associated with a separate proceeding,[2] the defendants filed an administrative record. The plaintiffs filed their motion for summary judgment on May 22, 2002, and the defendants countered with their own motion for summary judgment on June 26, 2002. The court now turns to the parties' crossmotions.

## III. ANALYSIS

### A. Legal Standard for Standing

■ Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. ART. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it

---

1. On April 12, 2000, the plaintiffs filed a motion for a temporary restraining order and preliminary injunction. Ten days later, however, the parties filed a joint stipulation withdrawing the plaintiffs' motion.

2. In December 2001, the defendants raised concerns that filing an administrative record for this case would violate a preliminary injunction, issued by a federal district court in Texas in a separate Freedom of Information Act proceeding, that barred the release of any

private information related to agreements between various farmers and ranchers and Wildlife Services. Joint Scheduling Proposal at 2–4. On April 3, 2002, the Texas court authorized the defendants in this case to file a redacted version of the administrative record. Joint Mot. to Govern Further Proceedings at 2. Pursuant to a scheduling order entered by this court, the defendants then filed the administrative record on April 24, 2002.

takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C.Cir.1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))

 As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130; *Steel Co.*, 523 U.S. at 104, 118 S.Ct. 1003; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C.Cir.2003). The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898–99 (D.C.Cir.2002). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct will suffice. *Id.* On a motion for summary judgment, however, the "plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* at 899 (citing Federal Rule of Civil Procedure 56); *accord Florida Audubon*, 94 F.3d at 666.

 To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C.Cir.1999) (citing *Steel Co.*, 523 U.S. at 103, 118 S.Ct. 1003). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it

must be likely that the requested relief will redress the alleged injury. *Id.* Our court of appeals has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C.Cir. 2001). Nor is there standing where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C.Cir.1980).

 The test for standing shifts focus when a plaintiff challenges an agency's failure to comply with a procedural requirement. *Florida Audubon*, 94 F.3d at 664 (citing *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130). In such cases, as long as the procedural requirement is designed to protect a threatened, concrete interest of the plaintiff, the violation is sufficient to grant the plaintiff standing. *City of Waukesha*, 320 F.3d at 234. To ensure that the plaintiff's interest is more than a general interest common to all members of the public, however, the procedural-rights plaintiff must show "that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Id.* (citing *Florida Audubon*, 94 F.3d at 664).

 If the plaintiff is an association, it may demonstrate standing as long as its members would have standing to sue in their own right, the interests that the association seeks to protect are germane to its purposes, and neither the claims asserted nor the relief requested requires the participation of the association's individual members. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d

610 (2000); *City of Waukesha*, 320 F.3d at 233. Finally, if the plaintiff is suing under the APA, the plaintiff must show that the injury falls within the zone of interests sought to be protected by the statute on which the plaintiff bases the complaint. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C.Cir.1996).

## B. The Court Concludes That the Plaintiffs Fail to Establish Standing

The plaintiffs in this case assert a procedural-rights challenge under the APA, claiming that the defendants have failed to comply with the procedural requirements of Use Restriction No. 9. Am. Compl. ¶¶ 89–90; Pls.' Reply at 3–4. Because the plaintiffs have failed to set forth specific facts showing that it is "substantially probable" that the defendants' alleged procedural breach will cause injury to the interests of the plaintiffs' members, the court concludes that the plaintiffs' members do not have standing. *City of Waukesha*, 320 F.3d at 234; *Sierra Club*, 292 F.3d at 899. Consequently, the plaintiffs do not have associational standing. *Friends of the Earth*, 528 U.S. at 181, 120 S.Ct. 693.

### 1. The Plaintiffs' Evidence of Standing

Following the guidance set by our court of appeals, the court resolves the question of standing based on evidence presented by the plaintiffs. *Sierra Club*, 292 F.3d at 899; *City of Waukesha*, 320 F.3d at 233. To demonstrate their associational standing, the plaintiffs point to the standing of their members, directing the court to affidavits from three members of Sinapu or Wildlife Damage Review as well as a wildlife authority.[3] Pls.' Reply at 2 & n. 2; *Friends of the Earth*, 528 U.S. at 181, 120 S.Ct. 693. In the first affidavit, Sinapu member Wendy Keefover–Ring outlines her experiences as director of Sinapu's Carnivore Protection Program in advocating in Colorado for wolves, coyotes, sage grouse, pine marten, swift fox, opossum, mountain lions, and black bear. Keefover–Ring Decl. ¶¶ 3, 6–10. She also notes her personal interest in backpacking and hiking in Colorado, Idaho, Arizona, Yellowstone National Park, and the Northern Rockies. *Id.* ¶¶ 12, 14. She then offers her view that

> [i]t is likely that M–44s are used in many of these areas where I have visited, although it is impossible to know because of the current injunction on the release of siteidentifying information[.] Further, because of the large ranges of many species affected by the M–44s, areas that I visit can be affected by M–44 placements many miles away. In some of these areas, it is likely that one could see wolves, grizzlies, jaguars, or California condors. In fact, my husband and I saw substantial evidence of bears and wolves in Montana's Gallatin Na-

---

**3.** Specifically, the plaintiffs direct the court to one affidavit attached to their reply, and incorporate by reference four affidavits that accompanied their motion for a temporary restraining order and preliminary injunction. Pls.' Reply at 2 & n. 2. One of the four affidavits incorporated by reference is of Dr. Marc Bekoff, an animal-behavior professor specializing in coyotes. Bekoff Decl. Although his affidavit presumably was relevant to the plaintiffs' motion for a temporary re-straining order and preliminary injunction, the affidavit does not appear to be relevant to the question of standing, as it focuses on demonstrating that discontinuation of the defendants' use of M–44 devices would not endanger livestock. *E.g., id.* ¶ 6 (stating that "it is far from certain that a decrease in the number of M–44s set by Wildlife Services would result in an increase in the number of coyotes").

tional Forest as well as witnessing wild wolves in Yellowstone National Park. *Id.* ¶ 13. She concludes that "[w]hen M–44s are used in these areas, it prevents wolves and other native carnivores from living or establishing themselves there." *Id.* ¶ 15. Consequently, she believes she will suffer a professional loss, a loss of biological health, a loss of psychological and spiritual health, an aesthetic loss, and a recreational loss. *Id.*

The second affidavit is from Wildlife Damage Review member and adventure tour company owner Rich Holtzin. Holtzin Decl. ¶¶ 2–3. He declares that "[w]hile working and recreating during the past several years, I have seen California condors on numerous occasions in Northern Arizona." *Id.* ¶ 4. He states that "[s]eeing the condors increases the aesthetic and spiritual pleasure of my work and recreation," and that if some of the condors were killed it would decrease that pleasure, as well as his business. *Id.* ¶¶ 5–7.

Likewise, in the third affidavit, Sinapu member Liz Thomas declares that while traveling in Utah, she saw a California condor, which gave her "a great deal of aesthetic and spiritual pleasure." Thomas Decl. ¶¶ 3–4. She states that because she frequently hikes or camps in southern Utah and is constantly keeping a look-out for California condors, the killing of some condors would lessen her spiritual and aesthetic enjoyment. *Id.* ¶¶ 5–6.

Finally, the plaintiffs submit an affidavit from Dr. Noel Snyder,[4] an evolutionary biologist who led the Fish and Wildlife Service's California condor project in the 1980s. Snyder Decl. ¶¶ 2–3. Dr. Snyder declares that at some point between 1980 and 1986, he personally witnessed a condor killed by an M–44 device. *Id.* ¶ 4. He

states that "[a]dditional condors may also have been killed by M–44s in the past but not have been detected or reported," and that while "M–44s have not been implicated as sources of known mortality in [condor releases in Arizona, they] could account for some of the mortality because of a failure to establish conclusive cause of death and disappearance without recovery of some birds." *Id.* ¶¶ 5, 7. He concludes that because condors released in Arizona "could easily have gone anywhere within the states of Nevada, Arizona, New Mexico, Colorado, Wyoming, and Utah ... any M–44s in [those states] present a significant risk to the California condors released in Arizona." *Id.* ¶¶ 9–10.

### 2. The Plaintiffs Fail to Establish Standing

 The plaintiffs seek to establish associational standing by demonstrating that its members have standing to bring this procedural-rights claim in their own right. Pls.' Reply at 2; *Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693. Accordingly, under this circuit's test for procedural-rights standing, the plaintiffs must set forth specific facts showing that it is "substantially probable" that the defendants' alleged failure to comply with Use Restriction No. 9 will cause injury to the interests of the plaintiffs' members. *Sierra Club,* 292 F.3d at 899; *Florida Audubon,* 94 F.3d at 666; *City of Waukesha,* 320 F.3d at 234.

The plaintiffs fail this test. Under a generous view of the plaintiffs' submissions and affidavits, the plaintiffs have established that their members have a concrete aesthetic, spiritual, professional, and recreational interest in viewing wolves, bears, and California condors[5] in Yellowstone

---

4. Dr. Snyder does not identify himself as one of the plaintiffs' members. *See* Snyder Decl.

5. Ms. Keefover–Ring also mentions grizzly bear and jaguars, stating that "it is likely that one could see ... grizzlies [or] jaguars" in

National Park and the states of Colorado, Montana, Arizona, and Utah.[6] Keefover–Ring Decl. ¶¶ 13, 15; Holtzin Decl. ¶¶ 5–7; Thomas Decl. ¶¶ 5–6. But the plaintiffs have not shown that it is "substantially probable" that the defendants' alleged failure to comply with Use Restriction No. 9 will cause injury to these interests. *City of Waukesha,* 320 F.3d at 234. The plaintiffs present no evidence to support a showing of substantial probability. *Sierra Club,* 292 F.3d at 899. For example, it is unclear whether M–44 devices cause harm to or deter the establishment of threatened or endangered species. The plaintiffs allege that M–44 devices have killed endangered species, but point only to a handful of questionable animal deaths. Pls.' Statement ¶ 4 (referring to the 1986 sandhill crane death in Mississippi and the 1998 wolf (or wolf hybrid) death); Keefover–Ring Decl. ¶ 9 (mentioning a 2002 report of a poisoned "wild wolf" in South Dakota). As for deterring the establishment of endangered species in new areas, Ms. Keefover–Ring merely asserts, without support, that "[w]hen M–44s are used in the[ ] areas [she visits], it prevents wolves and other native carnivores from living or establishing themselves there." *Id.* ¶ 15.

Nor do the plaintiffs present evidence that the M–44 devices harm the various species in which the plaintiffs have an interest. The plaintiffs' only references are to the disputed 1998 and 2002 "wolf" deaths. Pls.' Statement ¶ 4; Keefover–Ring Decl. ¶ 9. The plaintiffs say nothing about the impact of M–44 devices on jaguar, lynx, bald eagle, or grizzly bear. *See generally* Am. Compl.; Pls.' Mot. for Summ. J.; Pls.' Reply; Keefover–Ring, Holtzin, Snyder & Thomas Decls. As for California condors, Dr. Snyder admits frankly that "M–44s have not been implicated as sources of known mortality in [the release of condors in Arizona]" but states hopefully that the devices "could account for some of the mortality because of a failure to establish conclusive cause of death and disappearance without recovery of some birds." Snyder Decl. ¶ 7. He also reasons that because he observed a condor killed by an M–44 in the 1980s, "[a]dditional condors may also have been killed by M–44s." *Id.* ¶ 5.

Moreover, the plaintiffs fail to show that the M–44 devices are used in the geographic areas in which the plaintiffs have an interest. Ms. Keefover–Ring states only that "it is likely that M–44s are used in many of the areas" that she visits, but states that "it is impossible to know" because of the injunction issued in a separate court proceeding preventing the release of

"some of the[ ] areas" that she has visited. Keefover–Ring Decl. ¶ 13. "Purely speculative" allegations as to the type and location of species that may be seen by other persons, however, do not qualify as factual support for establishing her interest in viewing those species. *E.g., Tozzi,* 271 F.3d at 307.

**6.** Although the plaintiffs' APA claim refers to the defendants' wildlife control activities in all "areas where federally listed threatened or endangered animal species might be adversely affected," the affidavits refer only to Yellowstone National Park and the states of Colorado, Montana, Arizona, and Utah. *Compare* Am. Compl. ¶ 90 *with* Keefover–Ring, Holtzin

& Thomas Decls. Even if the court presumes that the plaintiffs' claims are restricted to those geographic areas, the "immense tracts of territory" represented by Yellowstone National Park and the four states renders problematic the plaintiffs' claim of standing. *Friends of the Earth,* 528 U.S. at 183, 120 S.Ct. 693 (holding that averments stating only that one of the organization's members uses unspecified portions of an immense tract of territory on some portions of which the disputed governmental activity has occurred or probably will occur could not survive summary judgment).

certain private information.[7] Keefover–Ring Decl. ¶ 13. Dr. Snyder posits only that condors released in Arizona "could easily have gone anywhere within the states of Nevada, Arizona, New Mexico, Colorado, Wyoming, and Utah ... [and] any M–44s in [those states] present a significant risk to the California condors released in Arizona." Snyder Decl. ¶¶ 9–10. Neither statement indicates that M–44 devices are in use in Yellowstone National Park and the states of Colorado, Montana, Arizona, and Utah.

Finally, even if the plaintiffs were able to show that M–44 devices cause harm to the species and in the areas in which the plaintiffs have an interest, the plaintiffs do not provide facts showing the defendants—rather than another agency—are the ones responsible for placing those M–44 devices. *See generally* Am. Compl.; Pls.' Mot. for Summ. J.; Pls.' Reply; Keefover–Ring, Holtzin, Snyder & Thomas Decls.

In short, the plaintiffs have failed to put forth any facts showing that it is "substantially probable" that the defendants' alleged failure to comply with Use Restriction No. 9 will cause injury to the plaintiffs' interests. *City of Waukesha*, 320 F.3d at 234. As a result, they fail to establish procedural-rights standing. *Id.*

The plaintiffs attempt to get around this hurdle by arguing that the standards for causation and redressability are "greatly relaxed" for a procedural-rights claim, and that

> there is no need to show "with any certainty" that the failure to use the Use Restriction 9 maps has in fact caused a reduction in endangered carnivore recovery, or that using the maps will increase recovery and plaintiffs' chances to see and appreciate endangered carnivores in the wild. Rather, it is enough that these are possible outcomes of failure and compliance with the procedural mandates of Use Restriction 9.

Pls.' Reply at 4 (quoting *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130). But the plaintiffs misread Justice Scalia's famous footnote outlining the procedural-rights doctrine.[8] *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (stating that "the person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redress ability and immediacy"). As our court of appeals has emphasized, "the Court has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Florida Audubon*, 94 F.3d at 664. In other words, the plaintiffs cannot substitute speculation for substantial probability, and hope that doing so will carry them across the causation bridge.

---

**7.** *See* note 3, *supra.* The defendants point out that the Texas court issued the injunction just three months before the plaintiffs filed their amended complaint, and that notwithstanding the injunction the plaintiffs' members "surely would be able to provide facts that through their visits they have observed harm to species from [the defendants'] M–44 placements, if that is indeed true." Defs.' Reply at 5.

**8.** The plaintiffs cannot invoke the talismanic words "procedural rights" to slip out from under the constitutional requirements for standing. Pls.' Reply at 4. The procedural-rights nature of a case "does not—and cannot—eliminate any of the irreducible elements of standing." *Florida Audubon*, 94 F.3d at 664. A procedural-rights plaintiff still must "establish the constitutional minima of injury-in-fact, causation, and redressability." *Wyoming Outdoor Council v. Forest Serv.*, 165 F.3d 43, 51 (D.C.Cir.1999).

*Id.; Winpisinger,* 628 F.2d at 139. To make sure that the proper defendants are before the court, the plaintiffs must show that "it is substantially probable" that the defendants' procedural breach will cause the plaintiffs' injury. *Florida Audubon,* 94 F.3d at 664. It is that probability that the plaintiffs have failed to demonstrate.

In short, instead of presenting the court with the specific facts necessary to demonstrate standing at this summary-judgment stage, the plaintiffs have presented a series of speculative assumptions that, when pasted together with inferential glue, hint that the defendants' procedural breach harms the interests of their members. *Sierra Club,* 292 F.3d at 899 (citing Rule 56); *Winpisinger,* 628 F.2d at 139; *Tozzi,* 271 F.3d at 307. Because the plaintiffs' members do not have standing in their own right, the plaintiffs therefore cannot assert associational standing. *Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693. Accordingly, the court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this *31st* day of March, 2003.