Michael L. SHAKMAN and Paul M. Lurie, et al., Plaintiffs-Appellees,

v.

George W. DUNNE, et al.,

and

Forest Preserve District of Cook County, Illinois,

and

Democratic Party County Central Committee for Cook County and its Members, et al., Defendants-Appellants.

Nos. 85–1870, 85–1911 and 85–1912.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1986.

Decided Aug. 5, 1987.

Rehearing and Rehearing En Banc Denied Sept. 30, 1987.

Kris E. Sholder, Asst. State's Atty., Chicago, Ill., for defendants-appellants.

C. Richard Johnson, Chicago, Ill., for plaintiffs-appellees.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

At issue in this class action is the constitutionality of the patronage hiring system maintained by the appellants in Cook County, Illinois. The appellees are independent candidates, independent voters, and taxpay-

ers who allege that the appellants' policy of using political "sponsorship" as a factor in determining who receives a Cook County government job, creates a substantial electoral advantage for the incumbent political office holder and, in doing so, violates the appellees' constitutional rights. The district court granted the appellees' motion for partial summary judgment on the issue of liability.[1] *Shakman v. Democratic Org. of Cook County*, 481 F.Supp. 1315, 1355 (N.D.Ill.1979). For the reasons set forth in the following opinion, we reverse.

## I

### Facts

In 1969,[2] Michael Shakman was an independent candidate seeking election as a delegate to the 1970 Illinois Constitutional Convention. Prior to the election, Mr. Shakman and Paul Lurie, a voter supporter, filed this lawsuit on behalf of themselves and all other independent candidates, independent voters. and taxpayers in Cook County, Illinois. The complaint alleged that various government agencies and officials in the City of Chicago and Cook County maintained and conspired to maintain a policy of hiring and retaining only those people who had received political sponsorship. The necessary sponsorship was usually obtained only on the basis of past political support or promises of future support for candidates endorsed by the Democratic Party. This support allegedly included both political contributions and political work on behalf of those candidates selected by the Democratic Party. Lack of sponsorship made employment unlikely and loss of sponsorship often resulted in dismissal. The plaintiffs alleged that this system of hiring and firing based on political sponsorship created an army of political work-

---

1. Appellees' motion for partial summary judgment as to the appellants' liability was granted on September 24, 1979. *Shakman v. Democratic Org. of Cook County*, 481 F.Supp. 1315 (N.D. Ill.1979). The remedy was left for later determination. On April 4, 1983, the district court entered the implementation order applicable to the hiring aspect of the case. Finding no just reason for delay, the district court ordered the entry of judgment pursuant to Fed.R.Civ.P. 54(b). Final judgment was thus entered as to

the hiring practices of the consenting defendants who are before this court as the appellants. This court's jurisdiction is based on 28 U.S.C. § 1291.

2. This litigation has been in progress since 1969. In this opinion, we set forth only the facts and procedural history relevant to the issues before the court.

ers and campaign funds that were not available to candidates who did not receive the endorsement of the Democratic Party. The plaintiffs argued that this system created a governmentally-maintained advantage for one political party. The complaint sought relief under 42 U.S.C. §§ 1983, 1985, 1986 and 1988 for violation of the plaintiffs' rights protected by the first, fifth and fourteenth amendments.

Before the election, in 1969, the district court dismissed the complaint. *Shakman v. Democratic Org. of Cook County*, 310 F.Supp. 1398 (N.D.Ill.1969). The district court held that the plaintiffs lacked standing to assert the rights of Democratic patronage employees and that any allegations that the harm done to the patronage employees also harms the plaintiffs are "too conclusory to support a cause of action upon which relief may be granted." *Id.* at 1402.

A divided panel of this court reversed that decision and remanded the case for further proceedings. *Shakman v. Democratic Org. of Cook County*, 435 F.2d 267 (7th Cir.1970), *cert. denied*, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971) (*Shakman I*). The panel first noted that, although the election had already been held, the practices challenged in the complaint were of a continuing nature and, therefore, the case was not moot. *Id.* at 268. The majority concluded that "the averments concerning the operation of the patronage system and the disadvantage it causes to candidates and voters who attempt to use the election process to change the direction of government are factual and give adequate fair notice of the claim asserted." *Id.* at 270. Relying on cases that involved the mechanics of the election process, the panel held:

> The interest in an equal chance and an equal voice is allegedly impaired in the case before us by the misuse of official power over public employees so as to create a substantial, perhaps massive, political effort in favor of the ins and against the outs. We conclude that these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury resulting from inequality in election procedure.

*Id.* Finally, the panel decided that the allegations did not present non-justiciable questions. *Id.* at 271. Chief Judge Swygert dissented on the ground that the case raised a non-justiciable political question not amenable to " 'judicially discoverable and manageable standards.' " *Id.* at 272 (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962)).

Following the remand, the parties entered into negotiations that produced a consent judgment entered on May 5, 1972. R.42; Consent Decree (May 5, 1972).[3] This judgment prohibits the defendants from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." R.42 at 4. The parties also agreed that they would continue to litigate the issue of whether political sponsorship or other political considerations could be considered in hiring new employees. *Id.* at 5.

Attempting to resolve the remaining hiring issue, the plaintiffs submitted requests to admit. Each defendant filed an almost identical response. R.89; R.90; R.103; R.105; R.106; R.108. Essentially, the defendants admitted that many departments and agencies in Cook County gave prefer-

---

**3.** Most of the Democratic defendants ultimately agreed to the 1972 consent judgment. Cook County Sheriff, Richard Elrod, and the Chicago Park District remained the only "non-consenting" Democratic defendants. *Shakman*, 481 F.Supp. at 1323. The district court entered partial summary judgment against the "non-consenting" defendants as to liability on the issues of political hiring, firing and promotion practices. *Id.* at 1349. The "non-consenting" defend-

ants have not appealed. After partial summary judgment was entered, but before the 1983 implementation order, the "non-consenting" Democratic defendants entered into separate consent decrees approved by the district court. All the appellants before this court had consented to the 1972 consent judgment prohibiting political firing. Therefore, the only issue before this court is the constitutionality of the hiring policy.

ence in hiring for many county jobs to those persons who had received political sponsorship from a Democratic Party official. Most of the jobs involved were not policy making positions and generally no public notice was given for those openings. The positions were normally classified as "temporary" despite the fact that many employees remained in them for years. The "temporary" status removed the job from the protection of the civil service statutes. The defendants also admitted that they believed that sponsorship was usually contingent on past political work or the expectation of political work in the future. The defendants also believed that a significant number of persons sponsored did some political work on behalf of candidates supported by the Democratic Party. Finally, the defendants admitted that they believed that this work helped elect candidates and that this perceived political advantage was one of the reasons that preference in hiring was given to those who had obtained sponsorship. Based on these admissions, affidavits, testimony from political science experts, transcripts from prior proceedings, and election results, both the plaintiffs and the defendants filed motions for summary judgment.

On September 24, 1979, the district court granted the plaintiffs' motion for partial summary judgment on the issue of liability. In a lengthy opinion, discussed in detail below, the district court concluded that the patronage hiring practice infringed upon the plaintiffs' rights protected by the first and fourteenth amendments. According to the district court, the record supported the plaintiffs' allegations that the government's hiring policy gave the Democratic candidates "an actual, significant advantage in elections." 481 F.Supp. at 1355. The policy purposefully discriminated against the plaintiffs and the government

had failed to provide a compelling interest furthered by the challenged practice. *Id.* The district court declared the patronage hiring practice unconstitutional.

The court deferred the issue of an appropriate remedy; therefore, it did not immediately enter a final judgment.[4] Instead, discussions concerning the appropriate remedy continued until April 4, 1983, when the district court entered judgment permanently enjoining the defendants from "conditioning, basing or knowingly prejudicing or affecting the hiring of any person as a Governmental Employee (other than for Exempt Positions), upon or because of any political reason or factor...." R.231 at 4. Defendants, George Dunne, President of the Board of Commissioners of Cook County; Stanley Kusper, Jr., the Cook County Clerk; Thomas C. Hynes, Assessor of Cook County; the Forest Preserve District of Cook County; the Democratic Party County Central Committee for Cook County and its members; and Edward R. Vrdolyak, filed notices of appeal.[5] R.306; R.309; R.310. To evaluate their arguments on appeal, we must first examine the district court's opinion on entry of partial summary judgment for the plaintiffs.

## II

### District Court's Opinion

The district court began its analysis by rejecting the defendants' argument that granting any type of relief to the plaintiffs would interfere with the conduct of state government or violate the principles of comity and federalism. 481 F.Supp. at 1326–27. The court also rejected the plaintiffs' argument that the Supreme Court's decision in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), required the court to grant their motion for summary judgment. 481 F.Supp. at 1327–28. The

---

4. The district court invited the parties to seek the certification of the interlocutory summary judgment order necessary for an immediate appeal pursuant to 28 U.S.C. § 1292(b). 481 F.Supp. at 1355 n. 51. The Democratic defendants filed a motion to have the summary judgment order certified for appeal under Fed.R. Civ.P. 54(b). R.190; 508 F.Supp. 1059, 1060–61. The district court denied the motion but

certified the summary judgment order for appeal pursuant to 28 U.S.C. § 1292(b). *Id.* The defendants filed a notice of appeal on March 16, 1981. R.191. The appeal, however, was dismissed by this court pursuant to the defendants' motions. R.193; R.194.

5. *See supra* note 3.

court recognized that both the plaintiffs and the patronage practice at issue in this case differed from those in *Elrod.* After disposing of these preliminary arguments, the district court began searching for a legal framework within which to evaluate the plaintiffs' allegations.[6]

Focusing first on the earlier opinion of this court, the district court noted that, although this court had held that the Constitution protected the interests involved in this case, it did not precisely identify the protected constitutional rights.[7] The plaintiffs' complaint alleged violations of the first and fourteenth amendments. Therefore, the court turned to other Supreme Court and Seventh Circuit precedent in search of an appropriate framework for evaluating the constitutional claims.

As a result of that search, the district court identified three separate rights protected by the first and fourteenth amendments which, in the court's view, are at issue in this case. First, the court concluded that "[t]o the extent that the allegations of the present complaint are true, ... the defendants have clearly burdened the plaintiff candidates' rights of free political belief and expression." *Id.* at 1333. Because the district court believed that the patronage hiring policy impeded the plaintiffs who chose to run against the Democratic Party, the court considered the policy a content-based restriction on speech. *Id.* The second constitutional interest identified by the district court involved the plaintiffs' right to associate with the political party of their choice. Analogizing the patronage hiring policy with a ballot restriction that has the effect of excluding certain candi-

dates, the district court concluded that, if the allegations were true, the hiring policy had rendered the associational rights of both the candidates and the voters less valuable. *Id.* at 1334. Finally, the district court decided that the patronage hiring policy deprived both the candidates and the voters of their right to "equal participation in the electoral process." *Id.* Not only are the candidates' rights to have an equal chance to win the election infringed by the patronage system but also "[t]he state is alleged to work against and make more difficult the election of certain candidates. To the extent this is true, ... the value of the votes of those supporting those candidates, in terms of their ability to affect the outcome of an election is lessened." *Id.* at 1335.

After isolating these three constitutional rights, the district court concluded that all the rights could be evaluated under the constitutional standards set forth in the ballot placement cases. *See Board of Election Comm'rs v. Libertarian Party,* 591 F.2d 22 (7th Cir.), *cert. denied,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); *Bohus v. Board of Election Comm'rs,* 447 F.2d 821 (7th Cir.1971).

Ballot placement cases ... involve allegations of governmental interference with the equality of the electoral process in a manner and to a degree similar to that charged in the present case. In ballot placement cases, unlike ballot access cases, the government has not excluded any candidate or candidates from the electoral process. Instead, the government is charged, as in the present case, with acting so as to favor, to some

---

6. The district court also held that the plaintiffs lacked standing as taxpayers to challenge the patronage hiring practice. 481 F.Supp. 1315, 1322 n. 1. We agree with the district court; the counts based on taxpayer standing are, therefore, dismissed. *See Frissell v. Rizzo,* 597 F.2d 840, 850 (3d. Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979) (applying *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), to a suit brought in federal court by a local taxpayer challenging the constitutionality of a local government expenditure).

7. The district court wrote:

There are two apparent gaps in the opinion that make analysis difficult. First, while there is general discussion of the protected nature of "the voter's interest in a voice in government of equal effectiveness with other voters" and a right of some sort to protection "from injury resulting from inequality in election procedure," these rights do not appear to be precisely defined and their scope is not stated. Second, while the court of appeals repeatedly used the phrase "constitutional protection," it did not define the nature of that protection.
481 F.Supp. at 1330.

relatively small degree, certain candidates because of their political affiliation. 481 F.Supp. at 1335. Therefore, the court adopted the two-part test established in these cases. "Once a plaintiff shows (1) an intentional discrimination by the government on the basis of his or her political beliefs that gives (2) an actual significant advantage in an election to his or her opponent ... he or she has demonstrated an infringement of that right." *Id.* at 1338. The burden then shifts to the government to demonstrate that the practice is necessary to the achievement of a compelling government interest.

The district court recognized that this *Bohus* test did not take the element of voluntary political work into consideration. The court also noted that the earlier opinion from this court may have indicated that coercion was an essential part of the plaintiffs' case. *Id.* at 1340. However, on the basis of its reading of more recent Supreme Court and Seventh Circuit cases, the court concluded that coercion was not relevant. "The plaintiffs need only show that the government, in sponsoring the patronage system, is purposefully discriminating against them on the basis of their political beliefs, and that the system provides regular Democrats with 'an advantage' in elections that they would not otherwise have." *Id.* at 1341.

Applying the two-part *Bohus* test to the facts in this case, the district court concluded that the admissions made by the defendants resolved any genuine issues of material fact. The court noted that the defendants had admitted that at least one of the reasons they gave preference in hiring to those who had received sponsorship, was to help elect Democratic candidates. This admission, the court concluded, established the intent to discriminate. Focusing on the defendants' statement that "[t]his political precinct work helps elect candidates supported by the various members of the Democratic County Central Committee," the district court decided that the defendants' admissions also established that the patronage system created an actual significant advantage in elections. *Id.* at 1345–46. The court refused to consider affidavits, submitted by the defendants, from political

scientists who concluded that the patronage system had little or no impact on election results, because the court concluded that this evidence was inconsistent with the admissions. *Id.* at 1346 n. 35.

Having determined that both parts of the *Bohus* test were met, the court applied strict scrutiny to the government's policy and required the defendants to establish a compelling governmental interest to justify the patronage hiring practice. *Id.* at 1349–54. The court found the record devoid of any compelling governmental interest that would justify the practice. Therefore, the court granted the plaintiffs' motion for partial summary judgment.

## III

### The Contentions on Appeal

The appellants have raised several objections to the district court's judgment. As in the first appeal, the appellants challenge the appellees' standing to litigate the constitutionality of the hiring policies. Next, they argue that the ballot placement cases do not provide an appropriate framework for evaluating the constitutional claims in this case. When the appropriate constitutional analysis is utilized, they submit, it becomes clear that no constitutionally-protected rights are infringed by the hiring practices. They also argue that proof of coercion is an essential part of the appellees' case and that the record contains no evidence that coerced political work had any impact on the outcome of elections. Finally, even if the district court has used the proper constitutional analysis, the appellants argue that genuine issues of material fact regarding the actual impact of the hiring practice on elections remain unresolved. The appellants request not only that we reverse the district court's decision to grant the appellees' motion for partial summary judgment but also that we grant appellants' motion for summary judgment.

## IV

### Discussion

A. *The Standing Requirement: The Need for Reexamination*

The case before us today is, from a *factual* viewpoint, a very different case from

the case set forth in the complaint. The consent decree with respect to politically-motivated discharges, R.42; Consent Decree (May 5, 1972), has eliminated a significant portion of the contentions that were originally presented in the appellees' complaint and that were before this court during the earlier appeal in 1970, seventeen years ago. The combined impact of political hiring and firing practices—a significant part of the plaintiffs' original case—is therefore not before us on this appeal. This appeal raises only the constitutionality of politically-motivated *hiring* practices without any reference to other patronage-based employment practices—including the discharge scheme now forbidden by the consent decree, R.42; Consent Decree (May 5, 1972). More importantly, we are confronted with a significantly different *legal* landscape than the one that confronted the district court at the time the complaint was originally filed in 1969, at the time of the first appeal to this court in 1970, or at the time the district court made the ruling now before us in 1979. During these intervening years, the Supreme Court has engaged in a thorough examination of "justiciability," the limitations imposed on federal courts by the "case-and-controversy" provision of article III.

These changes have made our consideration of the standing issue in this case most difficult. Indeed, one of the unhappy by-products of these changes has been that, with respect to the standing of voters and candidates to challenge hiring practices alone, we have not been able to regard the earlier holding of a panel of this court, dealing with the standing of voters and candidates to challenge the combination of hiring and firing practices, as having the precedential effect that we would normally accord such an earlier ruling of this court in the same litigation. The law of the case doctrine is not to be lightly disregarded. It is "based on the salutary and sound public policy that litigation should come to an end." *White v. Murtha*, 377 F.2d 428, 431 (5th Cir.1967); *see also Appleton Elec. Co. v. Graves Truck Line, Inc.*, 635 F.2d 603, 607–08 (7th Cir.1980), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981).

*See generally Roberts v. Cooper*, 61 U.S. (20 How.) 467, 481, 15 L.Ed. 969 (1858). However, it must be remembered that this doctrine "was understandably crafted with the course of ordinary litigation in mind." *Arizona v. California*, 460 U.S. 605, 618–19, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). Moreover, the question of justiciability, grounded in the case-and-controversy requirement of article III, is essentially jurisdictional in nature. As this court noted in *Christianson v. Colt Indus. Operating Corp.*, 798 F.2d 1051, 1056 (7th Cir. 1986), courts are significantly less constrained by the law of the case doctrine with respect to jurisdictional questions. Here, where there have been substantial pronouncements in this area since 1970, we are not only free to reexamine the holding of the earlier panel but obliged to do so.

## B. *The Standing Requirement: Governing Principles*

Our evaluation of the appellants' submission with respect to standing will be significantly advanced if we remember, as Chief Justice Warren stated in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), that standing is "an aspect of justiciability." *Id.* at 98, 88 S.Ct. at 1952. "Justiciability," the Chief Justice pointed out, is the "term of art employed to give expression to [the] dual limitation placed upon federal courts by the case-and-controversy doctrine." *Id.* at 95, 88 S.Ct. at 1950. This doctrine, at the heart of our constitutional concept of judicial power, embodies "two complementary but somewhat different limitations:"

> In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government.

*Id.* These policy concerns must guide our application of the analytical formula that

the Supreme Court has developed with respect to standing.

The basic criteria for standing have been set forth by the Supreme Court in many cases. Perhaps the most comprehensive is Justice O'Connor's statement in *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), that sets forth the three elements of the standing analysis: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 751, 104 S.Ct. at 3324; *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). *See generally Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976).[8]

The second criteria—that the injury be "fairly traceable" to the challenged action—is an important one if the values underlying the case-and-controversy requirement of article III are to be respected. "The party who invokes [judicial] power must be able to show ... that he has sustained or is immediately in danger of sustaining some direct injury" as a result of the action that forms the basis of the complaint. *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536, 95 L.Ed.2d 415 (1973); *Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937). The asserted injury must be shown to be "the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin*, 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975). *See generally Meese v. Keene*, —— U.S. ——, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *South E. Lake View Neighbors v. Department of Housing and Urban Dev.*, 685 F.2d 1027 (7th Cir.1982). "[U]nadorned speculation will not suffice to invoke the federal judicial power." *Simon*, 426 U.S. at 44, 96 S.Ct. at 1927; *see also Linda R.S.*, 410 U.S. at 618, 93 S.Ct. at 1149 ("The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative."). "[T]he remote possibility, unsubstantiated by allegations of fact, that [the plaintiffs'] situation might have been better had [the defendants] acted otherwise, and might improve were the court to afford relief," *Warth*, 422 U.S. at 507, 95 S.Ct. at 2209, is simply insufficient.

## C. The Standing Requirement: The Appellees' Case

As the Supreme Court indicated in *Warth*, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." 422 U.S. at 500, 95 S.Ct. at 2206; *see also South E. Lake View Neighbors*, 685 F.2d at 1034. However, the application of the principles governing the law of standing is hardly "a mechanical exercise." *Allen*, 468 U.S. at 751, 104 S.Ct. at 3324. It is often "appropriate and necessary to look to the substantive issues ... to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." *Flast*, 392 U.S. at 102, 88 S.Ct. at 1953; *see also Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 ("Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal,

---

8. Some of the earlier standing cases do not clearly delineate the second and third element of the analysis. *See Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984). As Justice O'Connor pointed ed out in *Allen*:

The "fairly traceable" and "redressability" components of the constitutional standing inquiry were initially articulated by this Court as "two facets of a single causation require-ment." C. Wright, Law of Federal Courts § 13, p. 68, n. 43 (4th ed. 1983). To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested. *Id.*

... it often turns on the nature and source of the claim asserted."). Given the novelty of the case, this is no easy task. Although several other cases have considered aspects of the patronage system, none have focused solely on the impact of patronage hiring policies on candidates and voters. *See, e.g., Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (discussing politically-motivated firing); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (discussing politically-motivated firing); *Avery v. Jennings,* 786 F.2d 233 (6th Cir.) (analyzing the impact of patronage hiring practices on prospective employees), *cert. denied,* — U.S. —, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *McCormick v. Edwards,* 646 F.2d 173 (5th Cir. Unit A 1981) (discussing firing resulting from political activity), *cert. denied,* 454 U.S. 1165, 102 S.Ct. 1042, 71 L.Ed.2d 323 (1982); *Illinois State Employees Union v. Lewis,* 473 F.2d 561 (7th Cir.1972) (discussing politically-motivated firing), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *Rutan v. Republican Party of Illinois,* 641 F.Supp. 249 (N.D.Ill. 1986), *appeal filed,* No. 86–2073 (7th Cir. argued Apr. 7, 1987) (primarily discussing the impact of politically-motivated hiring practices on employees).

In a thoughtful opinion, the district court, operating without very much guidance from the earlier opinion of this court,[9] suggested that three separate constitutional interests were infringed by the defendants' hiring policy: first, "the plaintiff candidates' rights of free political belief and expression," 481 F.Supp. at 1333; second, the plaintiff voters and candidates' right to associate, *id.* at 1333–34; and third, the plaintiff candidates and voters' right to equal participation in the electoral process, *id.* at 1334–35. In our view, however, the heart of the plaintiffs' case is their contention that the hiring practices of the defendants violate the speech and associational rights of candidates and voters.[10] As a general proposition, the right of candidates and voters to communicate freely is beyond question. It is also "beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958). It is also well-established that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). However, the recitation of these broad principles—as important as they are—does not provide us with sufficient guidance to resolve the issue of standing before us. A far more focused inquiry is required to determine whether the asserted injury is fairly traceable to the defendants' activity. We must more precisely "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff[s] seek[ ] to vindicate." *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983).

At the outset, it is important to note that the hiring practice at issue here is significantly different from the sort of activity that usually forms the basis of a challenge to an electoral system. Indeed, this case is not really a challenge to the mechanics of an electoral system at all. We are not

---

9. *See supra* note 7.

10. In the view of the district court, the appellees' case has an independent equal protection dimension because the hiring policy of the defendants constitutes a "debasement or dilution of the weight of a citizen's vote" similar to that prohibited by the reapportionment cases. *Shakman,* 481 F.Supp. at 1334 (quoting *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964)). The situation presented here is hardly the usual situation in which such a "dilution" claim is made. There has been no restructuring of electoral districts, no restrictions on a candidate's opportunity to appear on the ballot, or no attempt to place one candidate in a particularly advantageous place on the ballot. In our view, the plaintiffs' contention is tied to the merits of their speech and associational rights claims.

asked to evaluate any aspect of the electoral process—the procedure to get on the ballot or to obtain a place on the ballot. There is no claim that any candidate was deprived of the opportunity to run for office, to appear on the ballot, or to be given any particular place on the ballot. Nor is there any claim that a voter was deprived of the opportunity to vote for a particular candidate. Rather, the gravamen of the appellees' complaint is that the announced hiring practice of the appellants provided a decided advantage in communicating with the electorate and in effectively marshalling community support for the appellants' political cause.

This is not, of course, a claim that the speech and associational rights of the appellees are completely restricted. Rather, it is a claim that the hiring practice had the purpose and effect of giving the appellants a significant advantage in the process of communicating with the electorate. There can be no doubt that unequal treatment of speech by government officials can amount to content regulation of that speech—regardless of whether the government has acted to impede affirmatively the speech of a particular speaker or to assist artificially the speech of another. *See generally Police Dep't of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Here, government officials have not undertaken either of these roles in any direct manner. Rather, the appellees argue that the incumbents, by maintaining the practice of filling certain government positions with those who have supported them in the electoral process, have indirectly created such an inequality in the treatment of communication. Such a claim of an indirect injury must be scrutinized carefully.

When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. *E.g., Roe v. Wade,* 410 U.S. 113, 124, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.

*Warth,* 422 U.S. at 505, 95 S.Ct. at 2208.

### D. The Standing Requirement: The Appellees' Case and Causality

The Supreme Court of the United States has stressed that the "links in the chain of causation between the challenged Government conduct and the asserted injury," *Allen,* 468 U.S. at 759, 104 S.Ct. at 3328, are especially weak when the causal connection depends on many independent decisions of third parties. In *Simon,* the Court held that standing to challenge a government grant of tax exemption to hospitals could not be founded on the asserted connection between the grant of tax-exempt status and the hospital's policy concerning the provision of medical services to indigents. In that case, noted the Court, the causal connection depended on the decisions hospitals would make in response to withdrawal of tax-exempt status. 426 U.S. at 40–43, 96 S.Ct. at 1925–1927. Those decisions—made by many independent institutions for reasons tailored to the circumstances of the individual institution—were "sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action." *Allen,* 468 U.S. at 759, 104 S.Ct. at 3329. "Speculative inferences," *Simon,* 426 U.S. at 45, 96 S.Ct. at 1928, were necessary to connect the injury to the challenged action. Similarly, in *Allen,* the court found that there was insufficient causation in the claim of parents that their children's opportunity for a racially integrated public education was diminished by the federal tax exemptions granted to some racially discriminatory private schools which "accommodate white students avoiding attendance in desegregating public school districts." *Allen,* 468 U.S. at 746, 104 S.Ct. at 3322. Such a theory of causation:

involves numerous third parties (officials of racially discriminatory schools receiving tax exemptions and the parents of children attending such schools) who may not even exist in respondents' com-

munities and whose independent decisions may not collectively have a significant effect on the ability of public school students to receive a desegregated education.

*Id.* at 759, 104 S.Ct. at 3329.

In this case, we find the line of causation between the appellants' activity and the appellees' asserted injury to be particularly attenuated. As in the foregoing cases, the line of causation depends upon countless individual decisions. Moreover, those countless individual decisions must depend upon, according to the appellees' own theory of the case, countless individual political assessments that those who are in power will stay in power. It is not the hiring policy itself which creates any advantage for the incumbents. Any other candidate is entirely free to assert that, if elected, he will follow the same policy. Any advantage obtained by the incumbent is obtained only if potential workers make an independent evaluation that the incumbent, and not the opposition, will win. The plaintiffs will be at a disadvantage if—and only if—a significant number of individuals seeking political job opportunities determines the "ins" will remain the "ins."

Here, the appellants admit that one of the purposes of the patronage hiring policy was to "help[ ] elect candidates supported by the various members of the Democratic County Central Committee." R. 89 at 4. This admission simply states the obvious that some of the hundreds of office seekers in Cook County will undoubtedly decide that the incumbents are likely to remain the incumbents and, for that reason alone, will work for the incumbents during the campaign. Others—no one knows how many—while interested in a political job will consider such a factor as simply one of many motivating their decision to be politically active. For others, it may not be a factor in the decision to be politically active but may influence the character or intensity of their contribution. However, others who desire to obtain a political job may

read the political signs quite differently and decide, either as a matter of principle or expediency, that they ought to commit their energy to the political efforts of non-incumbents.

For each citizen, many factors, many not capable of articulation, will determine the nature and extent of that person's political activity. For those recruiting such political workers, political incumbency has advantages and disadvantages. In some political environments, a patronage hiring policy by the incumbents may enjoy a good deal of credibility with potential workers. Not only may the incumbents be able to point to a successful political track record, but they may also be able to demonstrate their determination to implement such a policy by their present actions. Moreover, in many instances, although not always, the incumbent enjoys certain natural advantages in communicating with the citizenry. However, in other political environments, incumbency may well be a ball and chain on the leg of the candidate and the announcement of such a patronage policy may, far from being an advantage, seal his political doom. Indeed, it may be the challenger who can attract workers with the promise that, once elected, he will continue to seek the help of those who have supported him. We do not believe, therefore, that the plaintiffs can assert, with the certainty required by the case-and-controversy requirement, that the injury they assert is "fairly traceable" to the actions of the defendants that form the basis of their complaint.

In reaching this conclusion, we have found instructive the thoughtful discussion of our colleagues on the District of Columbia Circuit in *Winpisinger v. Watson,* 628 F.2d 133 (D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980).[11] There, the court was faced with a claim of injury allegedly caused by the abuse of the power of incumbency. In that case, the plaintiffs, supporters of Senator Edward M. Kennedy in his quest for the presidential nomination of the Democratic Par-

---

11. While the *Winpisinger* court found it unnecessary to repudiate directly this circuit's holding in *Shakman I,* it also made it clear that it had serious reservations as to its correctness. *Winpisinger v. Watson,* 628 F.2d 133, 141 & n. 32

(D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980). While according this circuit's opinion "due respect," *id.* at 141, it also noted that *Shakman I* was decided prior to

ty, claimed that the abuse of the power of incumbency by members of President Carter's administration, including the power to hire federal employees on the basis of political affiliation, *id.* at 136, injured "plaintiffs' constitutional rights under the First and Fifth Amendments, as voters, contributors and participants in the process of Presidential nomination," *id.* at 135. The court, relying on both constitutional and prudential considerations, held that the plaintiffs lacked standing. With respect to constitutional concerns, the court determined that the plaintiffs had failed to demonstrate the requisite causal connection between the actions of the defendants and their alleged injury:

> In the case before us, whether an appellant is viewed in the character of a voter, contributor, a noncontributing supporter or a candidate for a delegate post, a court would have to accept a number of very speculative inferences and assumptions in any endeavor to connect his alleged injury with activities attributed to appellees.

*Id.* at 139.

There are, of course, factual differences between this case and *Winpisinger.* As the *Winpisinger* court indicated (albeit in its discussion of prudential rather than constitutional concerns), this case deals with a single activity—political hiring—rather than a wide-range of actions by the incumbents. It also involves a single county, not a coordinate branch of the federal government. *Id.* at 141. But these differences,

whatever their relevance with respect to prudential concerns,[12] have little pertinence when assessing whether the plaintiffs have demonstrated the requisite causality between their alleged injury and the actions of a political incumbent. It is no easier to measure the effect of an incumbent's promises on the ebb and flow of the political tide in Cook County, Illinois than it is in any other political context.[13]

A plaintiff cannot assert injury to his viability as a candidate or his influence as a voter simply on the basis of the advantage—real or imagined—of incumbency. Such a course would require that we resolve "profound questions of political science that exceed judicial competence to answer...." *LaFalce v. Houston,* 712 F.2d 292, 294 (7th Cir.1983), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984).[14] Tracing the appellees' asserted injury to the appellants' activity, *see Simon,* 426 U.S. at 41–42, 96 S.Ct. at 1925–26, must depend on more than the attempt of a federal court to take the political temperature of the body politic.

Finally, a word of caution is necessary. Our holding today deals only with the plaintiffs' standing to attack the constitutionality of the defendants' hiring practices. Our holding does *not* address the substantially different question of whether the plaintiffs would have standing to attack the constitutionality of the coerced political work demanded of those already employed by the government as a condition of continued employment. This latter question obvi-

---

the Supreme Court's reassessment of the standing requirement. *Id.* at 141 n. 32.

12. The District of Columbia Circuit, in addressing the prudential concerns, relied heavily on the political question doctrine. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). That aspect of justiciability concerns the relationship between the judiciary and the coordinate branches of the federal government. *See Elrod v. Burns,* 427 U.S. 347, 351, 96 S.Ct. 2673, 2679, 49 L.Ed.2d 547 (1976) (plurality); *Baker,* 369 U.S. at 210, 82 S.Ct. at 706.

13. The *Winpisinger* court also assumed that *Shakman I* involved "a system of coercing political activity through the threat of arbitrary dismissal for failure to participate." 628 F.2d at 141. In its present posture, the case involves a far more amorphous complaint—political hiring

*without* the companion practice of political firings.

14. Our holding today is limited, of course, to the situation before us. We do *not* address the question of whether candidates and voters would have standing to attack coerced political work demanded of those already employed by the government as a condition of continued employment. The Supreme Court has made it clear that the discharged employees have standing to bring such an action. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

Of course, we are not confronted with the question of whether those seeking employment could maintain an action against the defendants. This case does not involve plaintiffs in that situation.

ously raises substantially different considerations. Therefore, we explicitly note that nothing in our holding today can be construed as affecting the continued validity of the *Shakman* decree.

### Conclusion

Because we have determined that the plaintiffs do not have standing to assert the claim they bring to this court, we can proceed no further. Accordingly, the judgment of the district court is vacated and the case is remanded to the district court. Those aspects of the complaint which challenge the patronage hiring practice of the defendants are dismissed. The district court shall, in all other respects, retain jurisdiction.[15]

**15.** This appeal involves only the plaintiffs' allegations that the defendants' hiring practice, standing alone, was unconstitutional. Those portions of the complaint addressing this contention must now be dismissed. This appeal did not involve the plaintiffs' contention that politically-motivated discharges by the defendants are unconstitutional. That issue was the subject of a consent decree with respect to many of the defendants, R. 42, and of the court's unappealed judgment with respect to other defendants. *See supra* note 3. The district court continues to exercise jurisdiction to enforce its judgment with respect to those claims.