66 F.3d 328
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
John E. GRANT, Plaintiff-Appellant,
v.
CHICAGO PARK DISTRICT, Defendant-Appellee.
 No. 95-1018.
 United States Court of Appeals, Seventh Circuit.
 Argued Aug. 2, 1995.
Decided Sept. 14, 1995.
 
 Before BAUER, COFFEY and MANION, Circuit Judges.
 
 ORDER
 
 1
 In September 1992, plaintiff John E. Grant was fired by his employer, defendant Chicago Park District, for donating 187 cans of paint to two community organizations, and for lending a table-model radial saw to a friend, both in violation of the Park District's Code of Conduct. Grant claims that he was fired because he is black, and filed suit under 42 U.S.C. Secs. 2000e et seq. of the Civil Rights Act of 1964 (Title VII).[1] The district court ultimately granted summary judgment for the Park District. Grant appeals and we affirm the district court.
 
 I. Background
 
 2
 Since January 1, 1987 John Grant served as Director of Property for the Chicago Park District. On August 10, 1992, Robert Penn, then the Superintendent for the Park District, suspended Grant for 45 days after an investigation revealed that Grant had taken 187 gallons of paint[2] and donated them to a high school and a church. On September 18, 1992, Penn discharged Grant after the Park District's Office of Internal Investigations discovered that in April 1991, Grant had loaned a radial saw to a disabled friend who was making bed frames.
 
 
 3
 Grant, claiming he was fired because he was black, filed a claim for discrimination under Title VII. Initially the district court denied the Park District's motion for summary judgment as to the Title VII claim. After extensive discovery, however, the Park District renewed its motion for summary judgment, which the district court granted. The court found that Grant failed to present even a prima facie case of racial discrimination because he failed to establish that he was performing in accordance with the Park District's legitimate business expectations, since Grant had twice violated the Park District's Code of Conduct.[3] The district court also found that Grant had failed to establish a triable issue of whether the Park's District's reason for terminating Grant's employment was pretextual.
 
 
 4
 Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other material on file show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When a motion for summary judgment is made, the moving party must set forth specific facts showing that there is no a genuine issue as to any material fact and that the moving party is entitled to judgment as a mater of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits. He must go beyond the pleadings and support his contentions with property documentary evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
 
 
 5
 Grant must make out a prima facie showing of discrimination by establishing: (1) that he belongs to a racial minority; (2) that he was performing his job well enough to satisfy his employer's legitimate expectations; (3) that he was discharged; and (4) that after his discharge his employer filled the position with a non-minority person. Sample v. Aldi, 61 F.3d 544, 548 (7th Cir.1995); Hughes v. Brown, 20 F.3d 745, 746 (7th Cir.1994); Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1261-62 (7th Cir.1993), cert. denied, 114 S.Ct. 1372 (1994). Once a prima facie case is established, the Park District must offer a legitimate, non-discriminatory reason for its termination of Grant's employment. Grant is then required to show by a preponderance of the evidence that the legitimate reason offered by the Park District was not its true reason, but was a pretext for discrimination. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2747 (1993).
 
 
 6
 The district court found that even if Grant had sufficiently established a prima facie case of discrimination, he failed to show that the Park District's articulated reason for discharge (misappropriation of goods) was a pretext for discrimination. Grant, however, argues that he has shown that the explanation given by the Park District was pretextual by demonstrating that even if he did misappropriate property, it was insufficient to motivate the discharge in view of the fact that many others were doing the same thing. See Mechnig v. Sears Roebuck & Co., 864 F.2d 1359, 1364-65 (7th Cir.1988).
 
 
 7
 Plaintiff asserts that three similarly situated white employees, Donald Grisham, Charles Webber, and Michael Candella, who were involved in the paint donation decision, were not disciplined. The Park District's argument that Grant has failed to indicate any wrongdoing on the part of these other employees is persuasive.
 
 Donald Grisham
 
 8
 Grant's affidavit states: "Mr. Don Grisham, a caucasian employee, was the one who suggested I give the paint to a non-profit group. I told Mr. Charles Webber about Mr. Grisham's suggestion and he expressed no opposition to it." Also: "Grisham ... had discussions with Mr. Webber about the lead based paint." Grisham testified at his deposition that he only made an offhand remark: "I made a remark in the sense that it was a shame that someone couldn't get some use out of some of [the paint]. As like we do with a lot of things we condemn, old typewriters that are still good but someone could get use out of it with a littler repair, but we--there is a lot of things." Grisham testified that Webber told him to put the paint into 55-gallon drums and he would pick it up. Grisham replied that it was not his job, and Webber said he would do it himself. There is nothing here that indicates Grisham joined in, or even knew about, the subsequent misappropriation of property. And it must be remembered that Grisham was Grant's subordinate and thus his culpability would differ significantly from Grant's.
 
 Charles Webber
 
 9
 Grant's affidavit states: "Charles Webber, a caucasian male, was the environmental engineer. He was involved in the identification and disposal of hazardous waste. He was responsible for disposing of lead paint. Webber worked with the storekeepers and Michael Candella, assistant director of property, in identifying lead based paint." Webber testified at his deposition that he did not recall speaking with Grant or Candella about the lead-based paint. He did not recall receiving instructions from Grisham or anyone else to place the paint in 55-gallon drums, although he thought such instructions had probably been given to someone. Webber knew that his section was in charge of disposing of such waste, he had seen the paint, he had signed condemnation papers for the paint, but the paint had never been received by his section for disposal. At best, this shows that Webber was negligent in not verifying that the paint was properly disposed of--there is no inference of misappropriation on his part.
 
 Michael Candella
 
 10
 Grant's affidavit states: "Michael Candella is a caucasian male and a Shakman -exempt[4] employee and my assistant." Apparently Candella (who is white, and who took Grant's place upon his termination) was also aware of the paint distribution to the two community organizations. Nothing in the record indicates Candella misappropriated the paint. And again--Candella was Grant's subordinate and therefore is not similarly situated.
 
 
 11
 We agree with the district court that Grant failed to identify any wrongdoing on the part of the three employees in question, and at best had only presented evidence that "he had conversations" with these three men about the disposal of paint, but that Grant himself was the decisionmaker. The three men were not similarly situated because Grant was their superior and ultimately made the decision about who would receive the paint (including a donation to his own church), and it was Grant who gave the order to a Park District employee to deliver the paint to the designated recipients.
 
 
 12
 Grant also points to evidence that, apart from the paint and saw incidents, the Park District selectively enforced its rule against misappropriation of property. The crux of Grant's argument is that the Park District "regularly allowed white ... employees to use its property for non-Park District uses without penalty." Whatever the cause for such laxness in the past, once the Park District decided to start enforcing its Code of Conduct, it would need to do so evenly. It cannot permit one protected category of employees to dispose of property without sanction, while another category of employees is punished for the same conduct. If the Park District had been lax about enforcing the rules about use of Park District property, and then chose to start enforcing them, the stricter enforcement must be evenly imposed on all employees.
 
 
 13
 In McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976), the Court held that McDonnell Douglas applied even where the employees concerned has engaged in serious misconduct or crimes directed against the employer. "The Act prohibits all racial discrimination in employment, without exception for any group of particular employees, and while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination." McDonald, 427 U.S. at 283-84. While "theft of property entrusted to an employer" may be a compelling basis for discharge, it "does not diminish the illogic in retaining guilty employees of one color while discharging those of another color." McDonald, 427 U.S. at 284.
 
 
 14
 The district court found that these employees named by Grant were not similarly situated. He found Grant's particular offenses were rather severe (including exposing the Park District to potential legal problems due to the lead paint). Only Grant was identified as having committed two separate offense of misappropriation. Finally, as Director of Property Grant was the person who set the standard of propriety for employee conduct regarding the use of Park District property. We agree with the district court's rationale.
 
 
 15
 Grant also named Robert Nelson as an employee who was treated differently. Nelson, who was white, was an executive-level Shakman-exempt employee who "gave away an 18-foot boat which belonged to the Park District to a friend and he was not discharged even though it was brought to the attention of the Superintendent and to myself as director of property." The Park District points to Grant's answer "admitting" the Park District's statement of material fact that: "Mr. Grant knew about Mr. Nelson's actions at the time but did not believe Mr. Nelson had done anything wrong. (Grant Dep., pp. 202-05) Mr. Grant did not believe discipline was warranted against Mr. Nelson. Grant Dep., pgs. 202-05." The other employees listed by Grant involve much smaller appropriations (hedge clippers, an old desk, some chairs and tables, letting a scuba club use a projector), and all share the background that Grant never disciplined them because he thought they did nothing wrong. Grant's acceptance of these practices and his failure to initiate discipline or request that his superiors initiate disciplinary procedures cannot now be used as examples of disparate treatment. Also, the fact that Grant may have thought it was acceptable, given the past practice at the Park District, does not mean his superiors agreed or that their decision to enforce the rule when confronted with evidence against Grant--and not against anyone else--transformed it into a race-based decision.
 
 
 16
 It is most significant, then, that unlike any other employee who might have borrowed, donated, or taken their employer's property, Grant held a highly visible executive position. Without contradiction from Grant, the Park District describes Grant's position as one involving the responsibility for "millions of dollars worth of personal property used by the 3,000 Park District employees as they maintain the Park District's thousands of acres of property and hundreds of buildings." The Park District aptly relies on the undisputed point that Grant had a "special obligation to set the standard of behavior." Id. Moreover, Grant cannot rely upon his own failure to enforce Park District rules by allowing employees under his supervision to use Park District property, and then cry "everybody does it" when his superiors balk at his own misappropriation of property.[5]
 
 
 17
 Grant also relies on statistics reflecting an imbalance in the number of black employees charged with misappropriation of property. Between 1987 and 1992, the Park District brought discipline charges against 25 career service employees for misappropriating property. Of the employees, 13 were black (5 were discharged), 9 were white (2 were discharged), and 3 were hispanic (none were discharged). We cannot determine whether these were similarly situated employees. There is nothing in the record indicating what property these employees made away with, who initiated the investigations, or what discipline was imposed. Grant also presented statistics showing that the Park District terminated blacks in disproportionate numbers, but these statistics were not helpful because the included terminations were made for any reason, including the layoff of hundreds of seasonal employees.
 
 
 18
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Of the original four counts in the complaint, Grant voluntarily dismissed his claim of age discrimination (Count III), and does not appeal from an earlier order entering summary judgment for defendant as to Counts I and II
 
 
 [2]
 Some of the paint was lead-based and would normally be disposed of in accordance with environmental regulations
 
 
 [3]
 The Park District's Code of Conduct provides: "No officer or employee shall engage in or permit the unauthorized use of any Park District property, including, but not limited to, grounds, facilities or equipment. Use of Park District property for purposes other than Park District business shall be considered an unauthorized use."
 
 
 [4]
 Shakman -exempt employees are those city government employees who hold a high executive or policy-making position. These employees are similar to at-will employees who can be terminated for any non-discriminatory reason (including political). This term derives from the consent decree in Shakman v. Dunne, 829 F.2d 1387 (7th Cir.1987)
 
 
 [5]
 The Park District claims that since Grant was a Shakman -exempt employee, he fell into the at-will category, and could be discharged for any reason. This may be true, but even at-will employees may not be discharged for discriminatory reasons. Also, this argument implies that the Park District would have investigated and disciplined the other employees but for the fact that they (unlike Grant) were protected by various procedural due process considerations. This makes little sense, since Grant is not complaining of the lack of procedural due process in the suspension and termination process. The rules against misuse of Park District property apply to all employees. The only difference lies in the particular process used once disciplinary proceedings begin